**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, | Case No. 18-cv-7914 |
| *Plaintiff,* | |
| v. | Hon. Andrea R. Wood |
| BETSY DEVOS, in her capacity as Secretary of the United States Department of Education, and UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUCTION</u>**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

I.      Administration of the MSAP Grant Program………………………………………… 2

II.     CPS Receives an MSAP Grant .................................................................................... 4

III.    The Department Terminates CPS's FY 2018 MSAP Grant ................................. 5

IV.    Effects of the Department's Termination of CPS's FY 2018 MSAP Grant ...................... 7

ARGUMENT ................................................................................................................... 8

I.      CPS IS LIKELY TO SUCCEED ON THE MERITS ...................................................... 8

      A.     The Department Failed to Follow the Procedural Requirements for Withholding or Terminating MSAP Funds ................................................................................ 9

      B.     The Department Failed to Follow the Procedural Requirements to Withhold Federal Funds based on a Finding of Civil Rights Violations by OCR ............... 10

      C.     The Department's Decision was Arbitrary and Capricious. ................................. 12

      D.     The Department's Decision Exceeded its Statutory Authority ............................ 14

II.     CPS HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS NOT GRANTED. ...................... 15

III.    THE BALANCE OF INTERESTS FAVORS INJUNCTIVE RELIEF. ........................ 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................................... 9

*City of Arlington, Tex. v. F.C.C.*,
569 U.S. 290 (2013).................................................................................... 14

*Comm. & Control, Inc. v. F.C.C.*,
374 F.3d 1329 (D.C. Cir 2004).................................................................. 12

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................................................................................... 12

*Judulang v. Holder*,
565 U.S. 42 (2011)........................................................................................ 8

*Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*,
138 S. Ct. 1260 (2018)............................................................................... 16

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*,
No. 11-cv-6771, 2011 WL 5325545 (N.D. Ill. Nov. 3, 2011) ................. 16

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................................................................... 19

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,
128 F.3d 1111 (7th Cir. 1997) ................................................................... 16

*Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................ 9

*Nken v. Holder*,
556 U.S. 418 (2009)...................................................................................... 8

*Open Communities All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017)........................................................... 17

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
963 F. Supp. 1 (D.D.C. 1997)..................................................................... 19

*Planned Parenthood Ariz., Inc. v. Betlach*,
899 F. Supp. 2d 868 (D. Ariz. 2012) ......................................................... 17

*Planned Parenthood Gulf Coast, Inc. v. Kliebert*,
141 F. Supp. 3d 604 (M.D. La. 2015)......................................................... 17

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
699 F.3d 962 (7th Cir. 2012) ...................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ............................................................... 17

*Sec.& Exch. Comm'n v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................................ 12

*W. Illinois Home Health Care, Inc. v. Herman*,
150 F.3d 659 (7th Cir. 1998) ................................................................. 9

*Walgreen Co. v. Sara Creek Prop. Co., B.V.*,
966 F.2d 273 (7th Cir. 1992) ............................................................... 16

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) .............................................................. 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................. 8

## REGULATIONS AND STATUTES

2 C.F.R. § 200 ........................................................................................ 10

2 C.F.R. §§ 200.340-341 ......................................................................... 10

2 C.F.R. §§ 200.340–41 ............................................................................ 3

20 U.S.C § 1682 .............................................................................. 10, 11

20 U.S.C. § 1234 ..................................................................................... 9

20 U.S.C. § 1234d(b) ........................................................................ 3, 10

20 U.S.C. § 1234g(a) .............................................................................. 10

20 U.S.C. § 1234g(b) .............................................................................. 10

20 U.S.C. § 1682 ........................................................................ 4, 10, 11

20 U.S.C. § 7231 ...................................................................................... 2

20 U.S.C. § 7231(b)(1) ............................................................................ 2

20 U.S.C. § 7231b .................................................................................... 2

20 U.S.C. § 7231d(b)(2)(C) ..................................................................... 3

20 U.S.C. § 7231d(b)(2)(C)(i–iii) .......................................................... 14

20 U.S.C. § 7231d(c) ..................................................................... 3, 4, 14

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

20 U.S.C. §§ 7231-7231j ........................................................................................................... 9

34 C.F.R. § 100.1 .................................................................................................................... 10

34 C.F.R. § 100.8(c) ............................................................................................................ 4, 10

34 C.F.R. § 280.1(a) .................................................................................................................. 2

34 C.F.R. § 280.3 ...................................................................................................................... 3

34 C.F.R. § 75 ........................................................................................................................... 9

34 C.F.R. §§ 280.1-280.41) ...................................................................................................... 9

42 U.S.C. § 2000d-1 ............................................................................................................... 10

5 U.S.C. § 704 .......................................................................................................................... 8

5 U.S.C. § 706(2)(A) ................................................................................................................. 8

5 U.S.C. § 706(2)(C) ................................................................................................................. 8

5 U.S.C. § 706(2)(D) ................................................................................................................. 8

## INTRODUCTION

On September 27, 2018, without notice, a hearing, or an explanation of the factual basis for its decision, the Department of Education abruptly revoked over $4 million in grant funds from the Board of Education of the City of Chicago ("CPS"). These funds supported math and science programs at three Chicago schools that serve predominantly Hispanic and African-American CPS students in economically disadvantaged neighborhoods. The Department's unlawful withholding of the grant funds will irreparably harm CPS's ability to serve these students. With the current school year approaching the halfway mark, the opportunity for these students to receive the full benefit from the math and science programs will soon be lost. Through this motion, CPS requests that the Court prevent this injury pending the outcome of this litigation.

The Department has apparently never taken such an action—and for good reason. The statutes and regulations governing Magnet School Assistance Program ("MSAP") grants and non-discrimination requirements require that before terminating grant funds, the Department must give a grantee robust protections, including notice of the alleged deficiencies, an opportunity for a hearing, and judicial review of an administrative decision, *before* revoking such funds. The Department ignored those procedural requirements. The Department's decision also lacked substantive merit. The Department's purported rationale for revoking the funds is that CPS is not able to assure that its students will not be subjected to unlawful discrimination during the grant period. But the Department admitted that it revoked the funds without making any factual findings, and the perfunctory justification that the Department did provide was, on its face, arbitrary and capricious. Given these procedural and substantive failings, CPS is likely to succeed on the merits of its claims brought under the Administrative Procedure Act ("APA").

CPS will suffer irreparable injury without expedited intervention. Without the over $4 million in grant funds, the science, technology, engineering, and math ("STEM") programs at the

three Chicago schools will suffer. In an effort to continue these programs, CPS created a contingency budget that reallocated a limited amount of funds from other critical CPS educational programs. Of course, as a result of this reallocation of resources, other CPS education programs may be impacted. And even with these efforts, CPS will still fall far short of the $4 million in MSAP grant funds originally awarded by the Department.

CPS seeks a preliminary injunction enjoining the Department from distributing the over $4 million in FY 2018 MSAP grant funds to other jurisdictions pending the resolution of CPS's APA claims. This preliminary relief is warranted to prevent the irreversible harm resulting from the Department's unlawful termination of the grant.

## BACKGROUND

### I. Administration of the MSAP Grant Program

The MSAP is a federal grant program, authorized by statute and administered by the Office of Innovation and Improvement ("OII") within the Department, which provides grants to eligible local educational agencies ("LEAs") to establish and operate magnet schools. *See* 20 U.S.C. § 7231 *et seq.* The grants assist in the desegregation of public schools by supporting the elimination, reduction, and prevention of minority group isolation in elementary and secondary schools with substantial numbers of minority group students. 20 U.S.C. § 7231(b)(1); 34 C.F.R. § 280.1(a).

The MSAP authorizes the Department to award grants to eligible LEAs to carry out the purpose of the MSAP program for magnet schools that are either part of an approved desegregation plan or designed to bring students from different social, economic, ethnic, and racial backgrounds together. 20 U.S.C. § 7231b. As part of the application process for an MSAP grant, an eligible LEA must provide the Department assurances that it "will . . . not engage in" discrimination based on race, religion, color, national origin, sex, or disability in (i) "the hiring, promotion, or assignment of employees of the applicant or other personnel …"; (2) "the assignment of students

2

to schools" or "courses," "except to carry out the approved plan"; and (3) "designing or operating extracurricular activities for students."  20 U.S.C. § 7231d(b)(2)(C).  The MSAP statute states the following "special rule": "No grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) will be met."  20 U.S.C. § 7231d(c).  The "Assistant Secretary of Education for Civil Rights" ("Assistant Secretary") is the head of the Office for Civil Rights ("OCR") within the Department.

Before withholding or terminating MSAP grant funds, the Department must comply with procedural requirements set forth in several statutes and regulations.  First, the MSAP regulations state that the grants are governed by Title 2 of the Code of Federal Regulations.  *See* 34 C.F.R. § 280.3.  Under Title 2, prior to termination, the Department must provide notice and an opportunity to object to and provide information and documentation challenging the suspension or termination action in accordance with the processes and procedures published by the Department.  2 C.F.R. §§ 200.340–41.  Second, the General Education Provisions Act ("GEPA"), which applies to the MSAP, also includes specific notification and pre-decisional hearing requirements.  20 U.S.C. § 1234d(b).  Under the statute, before withholding payments under a federal program, the Secretary must notify the recipient in writing of (1) the intent to withhold payments, (2) the factual and legal basis for the decision that the recipient failed to meet its requirements, and (3) must provide "an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the recipient."  *Id.*

Finally, Title IX of the Civil Rights Act and the regulations governing the withholding of federal funds based on a finding of discrimination by OCR provide that no order suspending, terminating or refusing to grant or continue federal funding shall become effective until: (1) the responsible Department official has advised the recipient of federal funds of its failure to comply

and has determined that compliance cannot be secured by voluntary means; (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with an applicable legal requirement; (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. 34 C.F.R. § 100.8(c); *see also* 20 U.S.C. § 1682.

## II. CPS Receives an MSAP Grant

CPS applied for an MSAP grant in 2017. (Declaration of Anna M. Alvarado (the "Alvarado Declaration"), ¶ 4.) The Department selected CPS for a five-year MSAP grant on or around September 27, 2017. (*Id.*) In selecting CPS for an MSAP grant, the Department found that CPS would comply with all assurances required for the grant, including those assuring non-discrimination based on sex in the design and operation of extracurricular programs, during the pendency of the grant and the FY 2017 budget period. *See* 20 U.S.C. § 7231d(c). The Department awarded the grant to CPS in the following amounts:

| Budget Period | Fiscal Year | Amount |
|---|---|---|
| 1 | FY 2017 | $2,672,187.00 |
| 2 | FY 2018 | $4,023,426.00 |
| 3 | FY 2019 | $3,467,922.00 |
| 4 | FY 2020 | $2,683,557.00 |
| 5 | FY 2021 | $2,116,829.00 |

(Alvarado Decl. ¶ 4.)

The Department disbursed partial funding to CPS under the MSAP grant for Fiscal Year 2017, the first budget period. CPS used the FY 2017 funds to transform three existing elementary

4

schools—William H. Brown Elementary School, Claremont Academy Elementary School, and Joseph Jungman Elementary School—into high-quality STEM magnet schools. (*Id*. at ¶ 5.) Each school added new equipment and science-based technology, added new teacher and STEM coaching positions, and added hourly pay for professional development on STEM programs. (*Id*. at ¶ 6.) CPS developed a budget for the future operation of the STEM programs at the schools and planned to fund these programs using CPS's MSAP grant. (*Id*. at ¶ 7.)

## III. The Department Terminates CPS's FY 2018 MSAP Grant

By letter dated September 27, 2018, the Department notified CPS that OII had reviewed CPS's MSAP grant and had concluded that it was unable to award FY 2018 grant funds to CPS. (*See* September 27, 2018 OII letter, attached to Declaration of Joseph Moriarty (the "Moriarty Decl.") as Exhibit A (the "OII Letter").) The only rationale given for this determination was that "OCR's Assistant Secretary is unable to certify that CPS'[s] MSAP civil rights assurances 'will be met.'" (*Id.* at 1.)

In support of this determination, the OII Letter referred to "[c]ivil rights complaints filed with OCR" that "allege that CPS failed to provide a prompt and equitable response to reports of sexual violence of which it had notice, in violation of [Title IX] …" (Moriarty Decl., Ex. A, at 1.) But the Department did not identify which specific "complaints" formed the basis for its decision. (*See generally* Moriarty Decl., Ex. A.) The OII Letter also acknowledged that OCR had made "no findings" in the OCR investigations at issue. (*Id.* at 2.) The OII Letter stated that "facts already known to OCR's Assistant Secretary based on OCR's ongoing sexual violence investigations support the OCR Assistant Secretary's conclusion that CPS'[s] statutory non-discrimination assurance obligations prohibiting sex discrimination in the operation of extracurricular activities for students will not be met," but did not identify or describe a single "fact" that supported this conclusion. (*Id.*) OII's decision to withhold FY 2018 continuation funds was made without any

5

prior notice to CPS of any alleged concern that CPS would not comply with its FY 2018 assurances and without providing CPS any pre-decisional opportunity to respond to such concerns.

On October 4, 2018, CPS responded to the OII Letter and requested that OII provide the factual and legal basis for the conclusion that CPS "will not" comply substantially with Title IX in the future. (*See* October 4, 2018 CPS letter, attached to Moriarty Declaration as Exhibit B, at 2.) CPS also requested an opportunity to defend itself at a hearing and to detail the steps the District has taken to better safeguard students and ensure their rights are protected, before termination of the FY 2018 funds. (*Id.*) OII then sent CPS a letter following up on the original OII Letter on November 2, 2018. (*See* November 2, 2018 OII letter, attached to Moriarty Declaration as Exhibit C.) OII ignored CPS's request for a hearing, as well as CPS's request for the factual and legal basis of the funding decision. (*Id.*) Despite repeated requests, the Department has refused to provide CPS with *any* specific information about the factual basis for its decision to terminate CPS's FY 2018 MSAP Grant funds.

On October 16, 2018, CPS's congressional delegation wrote to Secretary DeVos to request clarification from OII regarding the decision to withhold CPS's FY 2018 MSAP funds. In an email response to the requests for information from CPS's congressional delegation, the Department acknowledged: (1) OCR had no written communication with CPS about the MSAP performance period continuation other that the September 27, 2018 OII letter which communicated the decision to withhold the FY 2018 grant; (2) in the entire history of the MSAP program, OCR has failed to certify an LEA's civil rights compliance on only two occasions, and neither involved a continuation grant; and (3) the Department reallocated CPS's FY 2018 funds that were not provided to CPS to the remaining MSAP grantees.

**IV.     Effects of the Department's Termination of CPS's FY 2018 MSAP Grant**

The Department's revocation has already adversely impacted CPS and its students. The Department's decision, for example, has left CPS without funding for teacher professional development programming, forcing CPS to suspend, put on hold, or reduce all such programming. (*See* Alvarado Decl. ¶¶ 8-11.) CPS has also been forced to suspend all plans for programming with other vendors, as originally planned for in CPS's Grant plan, including for STEM-based teacher professional development. (*Id*. at ¶ 9.) Because of the Department's termination decision, CPS had no choice but to alter its Grant plan by terminating, suspending, and cutting back these and a variety of other programs and services. (*Id*. at ¶¶ 9-10.) CPS has also significantly reduced student field trips, enrichment, and extra-curricular programming, as have other opportunities for students to learn more about, engage in, and expand their current STEM interests. (*Id*. at ¶ 10.) Much of CPS's plan for teachers to work collaboratively on units and integrative instruction will also not be realized. (*Id*.) Because of the loss of programming funds, CPS's marketing and recruitment efforts have been negatively impacted, which in turn has harmed CPS's ability to attract the diverse pool of student applicants necessary to support CPS's school desegregation efforts. (*Id*. at ¶ 11.)

Due to the Department's revocation of FY 2018 MSAP grant funding, in order to maintain STEM programming in the three recipient schools, CPS needs to reallocate funds originally intended for other critical student programs and services to cover the shortfall left by the Department's wrongful actions. (Alvarado Decl. ¶ 12; Declaration of Heather Wendell (the "Wendell Declaration"), ¶¶ 3-4.) In its contingency budget, CPS reallocated approximately $800,000 in funding in an attempt to partially cover the shortfall created by CPS's loss of FY 2018 funds. (Wendell Decl. ¶ 4.) These funds will need to be diverted from other funding sources that could be used to improve conditions for student learning, technology, and other STEM programs.

(*Id.* at ¶¶ 3-4.)  Even accounting for CPS's FY 2017 MSAP grant carryover funds in FY 2018 and the reallocation of funding intended for other CPS programs, the total expenditure in CPS's contingency budget for these programs will fall far short of the $4 million originally granted by the Department for FY 2018.  (Wendell Decl. ¶ 6.)

<u>**ARGUMENT**</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[W]hen the Government is the opposing party," the last two factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  For the reasons explained below, CPS is entitled to a preliminary injunction under this standard.

## I.      CPS IS LIKELY TO SUCCEED ON THE MERITS.

CPS has a significant likelihood of establishing that the Department acted unlawfully, arbitrarily, and capriciously in violation of the Administrative Procedure Act ("APA").  The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  The APA requires a reviewing court to hold unlawful and set aside an agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).  The APA also requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdictions, authority, or limitations[.]"  5 U.S.C. § 706(2)(A), (C).

In determining whether an agency action is "arbitrary [or] capricious" under the APA, a court must assess "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (internal quotation marks and citation omitted).  In other words, "the agency must . . . articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

The Department's decision to withhold FY 2018 MSAP grant funding from CPS, which

was a final agency decision reviewable by this court,[1] violated the APA for several reasons. First,

the Department failed to observe the procedure required by laws governing MSAP grants for

revoking the FY 2018 MSAP. Second, the Department failed to follow the procedural

requirements to withhold federal funds based on a finding of civil rights violations by OCR. Third,

the Department's revocation of the FY 2018 MSAP funds based on unidentified "facts," uncovered

during an investigation into complaints for which "no findings have been made," was arbitrary and

capricious. Finally, the Department's revocation of the FY 2018 MSAP funds violated the APA

because it exceeded the Department's authority under the MSAP statute and Title IX.

### A. The Department Failed to Follow the Procedural Requirements for Withholding or Terminating MSAP Funds.

The Department's decision to withhold FY 2018 MSAP grant funding from CPS was

governed by the MSAP statute and its implementing regulations (20 U.S.C. §§ 7231-7231j; 34

C.F.R. §§ 280.1-280.41), GEPA and the Education Department General Administrative

Regulations (20 U.S.C. § 1234 *et seq.*; 34 C.F.R. § 75 *et seq.*), the Uniform Administrative

---

[1] For agency action to be "final" under the APA, two conditions generally must be satisfied, both of which are met here: "First, the action must mark the 'consummation' of the agency's decisionmaking process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *W. Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998) (citing *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)). The decision to revoke over $4 million in funding is unquestionably a final decision. The Department communicated the decision to CPS as a "fait accompli:" the agency has apparently already reallocated CPS's FY 2018 MSAP funds to other districts, and has ignored CPS's request to reconsider the decision or allow any type of administrative appeal.

Requirements, Cost Principles, and Audit Requirements for Federal Awards in (2 C.F.R. § 200 *et seq.*), and the statutes and regulations governing OCR (20 U.S.C. § 1682; 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.1 *et seq.*). These statutes and regulations required that, prior to withholding FY 2018 grants from CPS, the Department must provide CPS notice of the factual and legal basis for its findings and the opportunity to challenge those findings at a hearing before an administrative law judge. 20 U.S.C. § 1234d(b); 2 C.F.R. §§ 200.340-341; 34 C.F.R. § 100.8(c). A decision by that administrative law judge would have been subject to judicial review, and the Department would have been forbidden from taking any action based on the decision until the completion of the judicial review. 20 U.S.C. §§ 1234g(a), (b).

The Department disregarded all of these requirements. The Department summarily terminated CPS's FY 2018 MSAP grant without providing CPS with pre-decisional notice of any "findings" upon which its decision was based, and ignored CPS's request for the factual and legal basis for the Department's decision and for an opportunity for a hearing. The Department reallocated the FY 2018 MSAP grant funds awarded to CPS to other grantees without affording CPS any process to challenge the basis for the Department's decision. Accordingly, CPS is likely to show that the Department's termination of CPS's FY 2018 MSAP grant was without observance of the procedures required by law and must be set aside.

### B. The Department Failed to Follow the Procedural Requirements to Withhold Federal Funds based on a Finding of Civil Rights Violations by OCR.

Title IX sets forth detailed procedural requirements that OCR must follow before it revokes federal funding from a recipient due to noncompliance with non-discrimination requirements on the basis of sex. Specifically, 20 U.S.C § 1682 provides that compliance with any requirement adopted pursuant to [Title IX] may be enforced "by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been *an*

*express finding on the record, after opportunity for hearing*, of a failure to comply with such requirement. . . . " 20 U.S.C. § 1682 (emphasis added). Further, "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined compliance cannot be secured by voluntary means." *Id*. If OCR terminates or refuses to continue a grant because of a finding that an educational institution discriminated on the basis of sex, OCR must "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved *a full written report of the circumstances and the grounds for such action*. No such action shall become effective until thirty days have elapsed after the filing of such report." *Id*. (emphasis added).

None of the above statutorily mandated procedural safeguards was followed in this case. First, as the Department admitted, there has been no express finding on the record of any violation, and no opportunity for a hearing provided to CPS prior to any such finding. (*See generally* Moriarty Decl., Ex. A.) Second, the Department did not advise CPS of its failure to comply or make a determination that compliance could not be secured by voluntary means prior to revoking the funding. Tellingly, the Department did not acknowledge or even consider the voluntary initiatives that CPS has recently undertaken to protect students from sexual assault and misconduct, and its decision offered no explanation as to how the steps taken by CPS were inadequate to assure voluntary compliance during the grant period. Finally, the Department revoked the $4 million in funding and reallocated the funds to other school systems without filing the requisite report with Congress or waiting the required 30-day period after filing the report. The Department's revocation of federal funds without following the procedural steps mandated by Title IX was without observance of the procedures required by law.

11

### C.     The Department's Decision was Arbitrary and Capricious.

On its face, OII's decision to revoke and reallocate CPS's FY 2018 MSAP grant funding was arbitrary and capricious.  An agency must articulate a rational connection between facts found and the choices it makes.  "It will not do for a court [or for the parties affected by an agency decision] to be compelled to guess at the theory underlying the agency's action[.]"  *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) ("[W]e insist that an agency ...  articulate a satisfactory explanation for its action." (internal quotation marks and citation omitted).

The Department has failed to articulate a rational and lawful explanation for its action of terminating CPS's FY 2018 MSAP funding.  The OII Letter states that the Department based its decision not on "findings" but on "complaints filed with OCR" and "facts already known to OCR's Assistant Secretary."  (Moriarty Decl., at Ex. A, at 2.)  But the Department does not identify these "complaints" or alleged "facts."  The Department has rebuffed CPS's request that the Department provide the factual and legal authority supporting its decision.  Without a satisfactory explanation for its action, the Department's decision was arbitrary and capricious.  *Comm. & Control, Inc. v. F.C.C.*, 374 F.3d 1329, 1335–36 (D.C. Cir 2004) (holding that a conclusion accompanied by "no explanation" is the epitome of "arbitrary and capricious" decision-making).

The arbitrary and capricious nature of the decision is further confirmed by the Department's radical departure from its past practice.  In a heavily redacted memo provided by the Department to CPS that purports to justify the funding revocation decision, the Department acknowledges that "historically denials to certify are rare" and that "OCR's primary objective is generally to assist and guide and MSAP applicant districts to correct civil rights problems using the positive leverage of the grant award, so that we can appropriately recommend that the Assistant Secretary certify that all applicants will meet their MSAP assurances."  (Moriarty Decl., Ex. D, at

12

2.)  The memo provides only two examples of instances where OCR declined to certify that a district will meet its civil rights assurances, both of which are factually and legally distinguishable.[2]  (*Id.* at 2, n. 1.)  Moreover, the mere fact of an OCR investigation cannot be the basis for revocation, because multiple jurisdictions across the country facing OCR investigations have received MSAP funding.[3]  Again, the Department has not explained and cannot explain why the significant steps that CPS has voluntarily undertaken to reduce the risk of and properly address sexual assault in its schools was not sufficient for it to meet its MSAP assurances for FY 2018.

Similarly, the Department offers no explanation as to how it could determine that CPS will not meet its non-discrimination obligations in the FY 2018 grant year based on allegations of past violations made in complaints that are still under investigation and for which "no findings have been made."  The tortured logic of the Department's rationale confirms that the decision is arbitrary and capricious and cannot stand.[4]

---

[2] As noted above, according to the Department, neither case involved a continuation of a grant. One example involves the failure to certify that a district could not meet its non-discrimination obligations with respect to the maintenance of single-sex schools. The other involves a district that used a race-conscious approach in determining admission to the schools to be funded by the MSAP grant. Both practices were openly promoted by the district at issue and raised substantial sex discrimination concerns on their faces, without the need for any substantial factual inquiry or analysis. In contrast, CPS disputes the allegations in the pending OCR complaints and the Department itself admits that there have been "no findings" made as to the validity of those complaints.

[3] The Department identifies the jurisdictions that have been awarded MSAP grants on their website. *See* Office of Innovation & Improvement, *Awards* (2018), https://innovation .ed.gov/what-we-do/parental-options/magnet-school-assistance-program-msap/awards/. The agency also lists the jurisdictions with open OCR investigations. *See* U.S Department of Education, Office of Civil Rights, *Pending Cases Currently Under Investigation at Elementary-Secondary and Pos-Secondary Schools as of November 2, 3018*, https://www2.ed.gov/about/ offices/list/ocr/docs/investigations/open-investigations/index.html. A cross-reference of the two lists reveals several jurisdictions throughout the country that have received MSAP grants despite open OCR investigations.

[4] The Acting Assistant Deputy Secretary of OII who signed the letter notifying CPS of the decision to revoke the FY 2018 MSAP funds announced his resignation from the Department on

### D.     The Department's Decision Exceeded its Statutory Authority

The Department of Education may only exercise authority conferred by statute.  *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013) (explaining that for "agencies charged with administering congressional statutes, both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*").  The Department's revocation of over $4 million in funding from CPS, based on unidentified factual allegations of past conduct and made in ongoing investigations of allegations unrelated to extracurricular activities and in which no findings have been made, fails to even superficially comply with the requirements of the MSAP statute.

The MSAP statute states that each grant application must provide "assurances that the applicant will not engage in discrimination based on race, religion, color, national origin, sex, or disability in: (i) the hiring, promotion, or assignments of employees or personnel; (ii) the assignment of students to schools or to courses within the school, other than to carry out the approved plans; and (iii) the design and operation of extracurricular activities for students."  20 U.S.C. § 7231d(b)(2)(C)(i–iii).  The statute further provides that no grants shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights ("OCR") determines that the above assurances will be met.  *Id.* at § 7231d(c).

These provisions do not require a grant applicant to provide a general assurance that the applicant will comply with civil rights laws, including Title IX, but rather require non-

---

the same day that the OII Letter was delivered to CPS, and according to news reports, left the Department shortly thereafter.  *See* Michael Stratford, *Top DeVos Aide Will Step Down Next Month*, Politico (Sept. 28, 2018), available at: https://www.politico. com/newsletters/morning-education/2018/09/28/legal-limbo-for-obama-era-borrower-defense-rules-356660.

discrimination assurances in the specific listed areas. In the OII Letter, the Department makes only the conclusory assertion that CPS's assurance obligations prohibiting sex discrimination "in the operation of extracurricular activities for students will not be met." (*See generally* Moriarty Decl., Ex. A.) It articulates no factual basis for this determination. The Department has refused to provide CPS with the factual basis for its determination that CPS's ability to meet its non-discrimination assurances with respect to extracurricular activities.

Moreover, OCR's authority under the MSAP statute is limited to a determination that the MSAP statutory assurances "will be met" during the grant period. There is nothing in the MSAP statute that authorizes or allows OCR to revoke a grant award based on allegations of past discrimination. The Department has exceeded its authority under the MSAP statute because, based on the limited rationale provided as to the basis of its decision, it revoked FY 2018 funding based on alleged sexual assault and violence incidents that occurred *prior to* the grant period. No finding has been made by OCR that CPS will not meet its MSAP non-discrimination assurances *during* the grant period. Notably, the Department provides no explanation as to how allegations of prior incidents that are still under investigation and have not resulted in any findings leads to the conclusion that CPS will not meet its non-discrimination obligations going forward. The MSAP statute does not give OCR authority to revoke funding or fail to certify a grant application based on allegations of past conduct that precedes the grant period, particularly allegations for which "no findings have been made."

## II. CPS HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS NOT GRANTED.

To demonstrate irreparable harm, a party must show that it "will likely suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044–45 (7th Cir. 2017), *cert. dismissed sub nom.*

*Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138 S. Ct. 1260 (2018).

"'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment."

*Walgreen Co. v. Sara Creek Prop. Co.*, *B.V.,* 966 F.2d 273, 275 (7th Cir. 1992). The requirements

of irreparable harm and lack of an adequate remedy at law tend to merge, as "[a]n injury is

'irreparable' when it is of such a nature that the injured party cannot be adequately compensated

in damages …." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, No. 11-cv-6771, 2011 WL 5325545, at

*5 (N.D. Ill. Nov. 3, 2011), citing *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d

1111, 1120 (7th Cir. 1997).

The Department's termination of CPS's MSAP 2018 funding irreparably harms CPS and

its students. In the first year of the MSAP grant, each of the three CPS schools that received FY

2017 grants funds—William H. Brown Elementary School, Claremont Academy Elementary

School, and Joseph Jungman Elementary School—used those funds to make significant

developments to their STEM-based education programs. (Alvarado Decl. ¶ 5.) Each school added

new equipment and science-based technology, opened two new teacher coaching positions, and

added hourly pay for professional development on STEM programs. (*Id.* at ¶ 6.) These STEM

programs have had a direct and positive impact on the CPS students in those schools. (*Id.*)

After receiving the FY 2017 MSAP grant funds, CPS developed a budget for the future

operation of the STEM programs at these three schools and earmarked the $4 million FY 2018

funds for specific purposes that would allow the schools to continue and expand their

implementation of those programs. (Alvarado Decl. ¶ 7.) As a result of the Department's unlawful

decision to withhold CPS's FY 2018 MSAP grant funds, however, the three schools were faced

with a lack of the resources necessary to sufficiently fund and develop their STEM programs. (*Id.*

at ¶¶ 8-11; Wendell Decl. ¶ 3.) CPS was therefore forced to choose between cutting services to

these STEM programs, or diverting funds from other CPS program and services to cover the $4 million shortfall. (Alvarado Decl. ¶¶ 8, 12; Wendell Decl. ¶ 4.) Under either scenario, critical CPS programs and services will be cut, resulting in immediate and irreparable harm to CPS and its students.

Irreparable harm occurs where a loss of income forces an organization to "shut down" its activities. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (likelihood of irreparable injury exists where "actions taken by the defendant have perceptibly impaired the organization's programs") (internal quotation and citation omitted). Courts routinely find irreparable harm where, as here, the loss of funding threatens to cause service cuts. *See, e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 980-81 (7th Cir. 2012); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 649-650 (M.D. La. 2015), *aff'd*, 862 F.3d 445 (5th Cir. 2017); *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 886 (D. Ariz. 2012).

The Department's unlawful decision to terminate CPS's $4 million MSAP funding due to CPS for FY 2018 has caused such an injury. In order to continue some STEM programs at the three magnet schools, CPS was forced to both pare back these programs, and to reallocate funds from other essential CPS programs and services to partially fund the STEM programs. (Alvarado Decl. ¶¶ 8-11; Wendell Decl. ¶¶ 4-6.) Even though the Department has allowed CPS to use its remaining MSAP grant funds from FY 2017 during FY 2018, because the amount of permitted carryover does not come close to equaling the $4 million of funds awarded to CPS for FY 2018, the total expenditure for these programs in CPS's contingency budget will fall far short of CPS's level of FY 2018 MSAP funding. (Wendell Decl. ¶¶ 3-6.)

17

The irreparable harm caused to CPS by the loss of the FY 2018 MSAP grant funds is not rectifiable by the entry of a final judgment. Without injunctive relief, CPS will be left without millions of dollars already earmarked to provide programs and services to its students in the current school year. (Alvarado Decl. ¶¶ 8-11.) In an attempt to partially cover the $4 million shortfall, CPS has already been forced to cut back STEM programming and divert resources from other funding sources. (*Id.*; Wendell Decl. ¶¶ 3-6.) Future post-judgment relief will not be able to undo the harm that this disruptive reallocation of funding will cause to CPS students.

In addition, the Department intends to disburse the $4 million in FY 2018 MSAP grant funding allocated to CPS to other jurisdictions around the country. As such, absent entry of an injunction, there is no possibility for CPS to recover the lost FY 2018 grant funding in the future. This is especially true given the fact that the 2018-2019 school year is approaching the halfway point. The imminent damage to the education of the CPS students who participate in the three STEM programs—for whom every moment of quality education counts—must be avoided. Only injunctive relief can prevent the imminent harms caused by the Department's unlawful withholding of CPS's FY 2018 MSAP grant.

## III. THE BALANCE OF INTERESTS FAVORS INJUNCTIVE RELIEF.

Finally, the equities and the public interest strongly favor an injunction. CPS used FY 2017 MSAP grant funds to help predominantly Hispanic and African-American children in economically disadvantaged neighborhoods gain access to high-quality STEM educational programs. These programs make a vital contribution to these communities, and there is a strong public interest in addressing segregation across the city and gaps in achievement among students of color and low-income students. Absent an injunction, the STEM programs at each of the three elementary schools that received FY 2017 MSAP grant funds will suffer.

On the other side of the scale, any harm that the Department will suffer as a result of the injunction would be negligible. Even the Department acknowledges through its own regulations (which it blatantly disregarded here) that the revocation of federal funding as a method to enforce non-discrimination requirements is a last resort that may be taken only *after* all other options have been exhausted. The Department had previously allocated the $4 million in grants funds to CPS, and an order preventing those funds from being disbursed to other jurisdictions will maintain the status quo that existed prior to the Department's unlawful revocation of the grant. Moreover, there is generally no public interest in the perpetuation of unlawful agency action. *See Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he public interest is best served by having federal agencies comply with the requirements of federal law …") (citation omitted); *League of Women Voters of United States v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (citation omitted).

*     *     *

## **CONCLUSION**

Based upon the foregoing, Plaintiff respectfully requests that this Court enter an Order:

a.      Granting Plaintiff's Motion for a Preliminary Injunction;

b.      Enjoining Defendants from disbursing CPS's FY 2018 MSAP grant funds to other jurisdictions pending final resolution of this case; and

c.      Granting such other and further relief as may be necessary and appropriate to ensure compliance with the applicable statutory and regulatory authorities.

A proposed Order is submitted herewith.

Dated: December _7_, 2018

Respectfully submitted,

/s/ John K. Theis
_____

| | |
|---|---|
| Michael A. Warner, Jr. | Ronald S. Safer |
| Nicki B. Bazer | Kelly M. Warner |
| Jacqueline Wernz | John K. Theis |
| FRANCZEK RADELET | Patricia T. Mathy |
| 300 S. Wacker Drive, Suite 3400 | RILEY SAFER HOLMES & CANCILA LLP |
| Chicago, IL 60606 | 70 W. Madison Street, Suite 2900 |
| *t* (312) 986-0300 | Chicago, IL 60602 |
| *f* (312) 986-9192 | *t* (312) 471-8700 |
| maw@franczek.com | *f* (312) 471-8701 |
| nbb@franczek.com | rsafer@rshc-law.com |
| jfw@franczek.com | kwarner@rshc-law.com |
| | jtheis@ rshc-law.com |
| | pmathy@rshc-law.com |

***Attorneys for Plaintiff The Board of Education of the City of Chicago***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2018, a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction was sent via electronic mail to Assistant United States Attorney Thomas P. Walsh, counsel for Defendants, as consented to in writing by Mr. Walsh on December 7, 2018.


*/s/ John K. Theis*_____