UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE BOARD OF EDUCATION OF THE, CITY OF CHICAGO, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 18 C 7914 |
| BETSY DEVOS, in her capacity as Secretary of the United States Department of Education, and UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) ) ) | Judge Wood |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**Table of Contents**

Introduction ................................................................................................................1

Facts .........................................................................................................................2

    I.    Statutory and Regulatory Background .........................................................2

    II.   Factual Background ....................................................................................5

    III.  CPS's Claims ...........................................................................................10

Argument ................................................................................................................11

    I.    No Likelihood of Success on the Merits .................................................12

        A.  No Final Agency Action .....................................................................12

        B.  Decision Committed to Agency Discretion .........................................16

        C.  Notice-and-Hearing Requirements Do Not Apply ...............................20

    II.   No Irreparable Injury ...............................................................................22

    III.  Balance of Hardships and Public Interest Weigh Against Injunctive Relief ..............23

Conclusion ..............................................................................................................25

i

# Table of Authorities

## Cases

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................ 12

*Community Action of Laramie County, Inc. v. Bowen*, 866 F.2d 347 (10th Cir. 1989) ................ 17

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079 (7th Cir. 2008) ................................................................................................................ 11

*Heckler v. Chaney*, 470 U.S. 821 (1985) ............................................................... 16, 17

*Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659 (7th Cir. 1998) ............................ 12, 15

*Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir. 1986) ...................................... 11, 24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ................................................................................................ 24

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ........................................................................... 16

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) .................................. 11

*Scalise v. Thornburgh*, 891 F.2d 640 (7th Cir. 1989) ...................................................... 17

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016) ................................ 14

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ...................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, (2008) ............................................. 23, 24

## Statutes

5 U.S.C. § 702 ................................................................................................. 16

5 USC § 701(a)(2) ........................................................................................... 16

20 U.S.C. § 1234d ........................................................................................... 20

20 U.S.C. § 1234d(b) ....................................................................................... 20

20 U.S.C. § 1682 ........................................................................................ 20, 22

20 U.S.C. § 7231(a) ........................................................................................... 3

20 U.S.C. § 7231- 7231j ................................................................................. 2

20 U.S.C. § 7231c ......................................................................................... 3

20 U.S.C. § 7231d(b)(2)(C) ....................................................................... 3, 4

20 U.S.C. § 7231d(c) ............................................................................. passim

20 U.S.C. § 7231h(a) ..................................................................................... 4

20 U.S.C. §§ 1681-1688 ................................................................................. 6

31 U.S.C. § 1502 ........................................................................................... 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE BOARD OF EDUCATION OF THE, CITY OF CHICAGO, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 18 C 7914 |
| BETSY DEVOS, in her capacity as Secretary of the United States Department of Education, and UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) ) ) | Judge Wood |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

### Introduction

The Chicago Public Schools (CPS) alleges that the U.S. Department of Education (Department) terminated its continuation grant under the Magnet Schools Assistance Program (MSAP) and denied CPS $4 million. CPS's allegations, however, reflect a misunderstanding of the status quo. CPS's continuation grant has not been "terminated." Nor has CPS's initial, year-one grant been cut off. Instead, CPS is currently allowed to use funds it received from the Department for the first year of its MSAP grant — of which it had, as of the time of CPS's motion, almost $1.5 million in unspent funds. And if CPS brings itself into compliance with its nondiscrimination assurances required under MSAP and meets other continuation award requirements, CPS will be able to receive a continuation award.

As a precondition for any MSAP continuation grant, the Department's Assistant Secretary for Civil Rights must certify that CPS will meet its statutorily-mandated nondiscrimination

assurances for an MSAP grant for the upcoming year. CPS, as one district applying for a continuation grant, was subject to the exact same certification requirement as all other districts applying for continuation grants.

Based on information gathered by the Department's Office for Civil Rights (OCR) while investigating complaints that CPS failed on a district-wide level to address incidents of sexual violence in its schools, the Assistant Secretary was unable to certify that CPS would comply with the MSAP nondiscrimination assurances for the upcoming year. But rather than not continue CPS's grant, the Department instead deferred its funding decision to allow CPS additional time to bring itself into compliance, and to obtain the requisite certification in order to receive continued grant funds. In addition to allowing CPS to continue to serve students by using remaining year-one MSAP grant funds, the Department has corresponded with CPS on several occasions to explain why the Department deferred its decision on continuation funding to CPS, and advised CPS of steps that CPS could take to bring itself into compliance to obtain the required certification and receive continuation funding. This matter does not require court intervention.

CPS alleges that the Department's decision to delay an MSAP continuation grant was arbitrary and capricious, exceeded its authority, and violated procedural requirements. CPS seeks a preliminary injunction to enjoin the Department from awarding fiscal-year 2018 grant funds until this litigation is resolved. But this court should deny CPS's motion for preliminary relief because the requested injunctive relief is unnecessary. As long as CPS satisfies its continuation grant requirements, including obtaining the Assistant Secretary's certification, up to $4 million is available to award to CPS for its year-two continuation grant. In any event, the court should also deny CPS's motion because it has no likelihood of success on the merits, CPS will suffer no irreparable injury, and the balance of hardships favors the Department, which seeks to award

needed grant funds to school districts while also ensuring they will comply with their nondiscrimination assurances under the MSAP.

<strong>Facts</strong>

**I.     Statutory and Regulatory Background**

The Magnet Schools Assistance Program (MSAP) is authorized as part of the Elementary and Secondary Education Act, and is administered by the U.S. Department of Education (Department). 20 U.S.C. § 7231- 7231j; 34 C.F.R. Part 280. MSAP provides funding to "local educational agencies" (LEAs) for use in magnet schools that are part of an approved desegregation plan and are designed to bring students from different social, economic, ethnic, and racial backgrounds together. 20 U.S.C. § 7231(a)4; 34 C.F.R. § 280.1.[1] Projects supported by MSAP grants are designed to reduce, eliminate, or prevent minority group isolation in elementary and secondary schools with substantial proportions of minority students, and assist in voluntary desegregation in public schools. *Id.*

No MSAP grant may be awarded unless the Assistant Secretary of Education for Civil Rights (OCR Assistant Secretary)[2] determines that the assurances required in the MSAP statute will be met. 20 U.S.C. § 7231d(c). These assurances include that the MSAP grant recipient will "not engage in discrimination based on race, religion, color, national origin, sex, or disability in":

---

[1] Although not at issue in this case, in order to be eligible to receive an MSAP grant, an LEA must be implementing a required desegregation plan undertaken pursuant to a final order issued by a court of the United States, or a court of any State, or any other State agency or official of competent jurisdiction; or a voluntary desegregation plan adopted and approved by the Secretary of Education as adequate under Title VI of the Civil Rights Act of 1964. 20 U.S.C. § 7231c. LEAs like CPS must also provide an assurance that the desegregation plan is being implemented as approved. 34 C.F.R. § 280.20(e).

[2] The OCR Assistant Secretary is the head of the Department's Office for Civil Rights (OCR).

(i) "the hiring, promotion, or assignment of employees of the applicant or other personnel for whom the applicant has any administrative responsibility"; (ii) "the assignment of students to schools, or to courses of instruction within the schools, of such applicant, except to carry out the approved plan"; and (iii) "designing or operating extracurricular activities for students."  20 U.S.C. § 7231d(b)(2)(C); 34 C.F.R.§ 280.20(b)(3), (4), and (5).  MSAP regulations further provide that upon request, LEAs shall submit any information that is necessary for the OCR Assistant Secretary to determine whether the assurances will be met.  34 C.F.R. § 280.20 (d); 34 C.F.R. § 75.231.  These requirements are unique to MSAP.

MSAP applications are competitively selected for funding in accordance with procedures set forth in the MSAP regulations in 34 C.F.R. Part 280 and the Education Department General Administrative Regulations in 34 C.F.R. Part 75.  Under a discretionary grant program such as MSAP, the agency exercises judgment in selecting applications for funding.  34 C.F.R. § 75.200. Applicants are scored based on the quality of their applications, and the highest scoring applications are reviewed for eligibility by the office that administers MSAP and awards the grants, the Office of Elementary and Secondary Education,[3] and by the OCR Assistant Secretary, who must determine whether the statutory nondiscrimination assurances will be met.  20 U.S.C. § 7231d(b)(2)(C).

 MSAP grants are approved for a five-year project period.  20 U.S.C. § 7231h(a).  Current MSAP grantees received their year-one MSAP grant in fiscal year (FY) 2017.  MSAP grants are

---

[3] At the time CPS received its MSAP year-one award, MSAP was administered by the Department's Office of Innovation and Improvement.  As of January 2019, the Department consolidated the Office of Elementary and Secondary Education (OESE) and the Office of Innovation and Improvement into a single office.  In this brief, the term "Education" includes OESE, the office that administers MSAP.

4

awarded only for one budget period at a time.[4]  34 C.F.R. § 75.251(b).  Before Education makes an award to an MSAP grantee for a subsequent budget period — a "continuation award" — the OCR Assistant Secretary and Education conduct separate reviews of each project.  The OCR Assistant Secretary determines, in accordance with 20 U.S.C. § 7231d(c), whether the MSAP grantee will meet the required nondiscrimination assurances in the upcoming budget period.  20 U.S.C. § 7231d(c); 34 C.F.R. § 280.20.

Assuming Congress has appropriated sufficient funds for the MSAP program, Education considers whether the grantee has made substantial progress in achieving the goals and objectives of the project and whether continuation of the project is in the best interest of the federal government.  34 C.F.R. § 75.253(a)(2) and (4).  In evaluating whether the grantee has made substantial progress, the agency may consider any information relevant to the authorizing statute. 34 C.F.R. § 75.253(b).  In the case of MSAP grants, Education cannot make a continuation award unless the OCR Assistant Secretary has determined that the grantee will meet its nondiscrimination assurances for the upcoming year.  20 U.S.C. § 7231d(c); 34 C.F.R. § 280.20.  Education also determines the amount of new continuation funds to award based on such considerations as the amount of the grantee's available unused funds from the previous year.  34 C.F.R. § 75.253 (c)(2)(ii) and (c)(3).

---

[4]  *Budget Period* is defined in 34 C.F.R. § 77.1 to mean an interval of time into which a project period is divided for budgetary purposes.  In order to fund grants under the MSAP authorizing statute, Congress enacts annual fiscal year appropriations statutes.  *Fiscal year (FY)* is defined to mean the Federal fiscal year — a period beginning on October 1 and ending on the following September 30.  FY 2017, for example, began October 1, 2016 and ended September 30, 2017.  There is no requirement to fund consecutive budget periods of a multi-year project with funds from consecutive fiscal year appropriations as long as funding the project is addressing a *bona fide* need for the fiscal year in which the continuation award is being made.  31 U.S.C. § 1502.

## II.    Factual Background

CPS was selected for a new MSAP grant for a five-year project period and received FY 2017 funding of $2,672,187 for use in its year-one budget period, which ran from October 1, 2017 to September 30, 2018. 34 C.F.R. § 75.251(b)(1) and (2); Complt. ¶ 26; CPS Mem at 4.[5]  CPS planned to use the MSAP funds to transform three existing elementary schools into magnet schools with a focus on science, technology, engineering, and mathematics (STEM).  Complt. ¶¶ 26-28.  As a prerequisite for selecting CPS for this grant, the OCR Assistant Secretary determined in 2017 that CPS would meet the required nondiscrimination assurances under the MSAP statute for its year-one budget period.  20 U.S.C. § 7231d(c); 34 C.F.R § 280.20; Complt. ¶ 29.

As with all MSAP continuation grants, CPS's MSAP project was reviewed between May and September 2018 for continuation funding for its year-two grant.  Complt., Ex A.  As part of that review, the OCR Assistant Secretary was again required to determine whether CPS would meet the required nondiscrimination assurances in year two, and he was unable to conclude that it would.  20 U.S.C. § 7231d(c); 34 C.F.R § 280.20; 34 C.F.R. § 75.253; Complt. Exs. A, D.  In making that determination, OCR reviewed CPS's MSAP application and its performance report submitted after year one.  *Id.*  OCR also sent formal correspondence to the Department of Justice's Employment Litigation, Educational Opportunities, and Disability Rights Sections, as well as the Equal Employment Opportunity Commission, and OCR Regional Offices to inquire as to whether there were any outstanding findings of civil rights violations or other causes for concern.  *Id.*

The OCR Assistant Secretary also considered all other relevant information.  *Id.*  This included the facts gathered over the prior year while investigating two existing systemic civil rights

---

[5] "CPS Mem. __" refers to the memorandum of law in support of plaintiff's motion for a preliminary injunction.

complaints filed with OCR, alleging that CPS failed to provide a prompt and equitable response to reports of sexual violence that it had notice of, in violation of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681-1688, and its implementing regulation, 34 C.F.R. Part 106. Complt., Ex. A. In addition to those two complaints filed in 2015 and 2017, OCR received and began investigating additional Title IX complaints against CPS in 2018. Declaration of Philip Rosenfelt, ¶ 3 (attached as Exhibit 1). OCR also learned that CPS had reported 358 incidents of sexual harassment/misconduct by district staff, volunteers, and other adult third parties for the 2012-13, 2013-14, 2014-15, and 2017-18 school years. Complt. Ex. D. The OCR complaints and the facts gathered by OCR in its ongoing investigations included evidence of potential Title IX violations in extracurricular programs as well as potential district-wide Title IX violations that affected all CPS schools — including the MSAP project's magnet and feeder schools — and extracurricular programs. Complt. Exs. A, D.

Moreover, the *Chicago Tribune* published investigative findings in the summer of 2018 based on its review of 523 CPS student reports of being sexually abused or raped in the last ten years (an average of one per week) and detailed systemic issues within the school district, which failed to correct "obvious child-protection mistakes."[6] As a result of the *Tribune* reports, CPS hired a Chicago law firm to conduct an independent review of the school district's response to sexual violence. Complt. ¶ 35(a). In August 2018, the law firm issued a preliminary report.[7] This report

---

[6] The *Tribune's* first series of investigative reports was published in June 2018 and titled *Betrayed*. See http://graphics.chicagotribune.com/chicago-public-schools-sexual-abuse/. The *Tribune* released a new set of investigative reports about a month after the *Betrayed* series that focused on sexual misconduct between CPS students and revealed similar systemic failures regarding child protection. See http://graphics.chicagotribune.com/chicago-public-schools-sexual-abuse/.

[7] See http://blog.cps.edu/wp-content/uploads/2018/08/CPS-Preliminary-Report.pdf.

by CPS's consultant identified repeated "systemic deficiencies" in training, incident reporting, data collection, and trend tracking that pervaded city schools and the City's downtown headquarters. The preliminary report further describes how understaffed and underfunded CPS investigators struggled to process reports of potential sexual harassment, notifications sent to the Department of Children and Family Services, employee misconduct allegations, and altercations between students and staff. The CPS-commissioned report concluded that "while there were policies and procedures about sexual misconduct on the books, employees were not consistently trained on them, and there were no mechanisms to ensure that they were being uniformly implemented or to evaluate their effectiveness."

Based on the facts learned in OCR's ongoing investigation of systemic sexual violence cases since its previous MSAP review in 2017, the OCR Assistant Secretary had serious concerns about CPS's civil rights compliance and determined in September 2018 that he could not certify that CPS would satisfy its nondiscrimination assurances for the upcoming budget period. Complt., Exs. A, D. Based on the Assistant Secretary's decision, Education was unable to award continuation funding to CPS for its year-two budget period at the time FY 2018 funds were available to the agency for obligation, October 1, 2017 to September 30, 2018. Complt. Ex. A. Education advised CPS in a September 27, 2018 letter that while there had been no findings regarding the Title IX complaints that OCR was investigating, facts known to the OCR Assistant Secretary in connection with OCR's ongoing sexual violence investigations supported the Assistant Secretary's determination that CPS's MSAP assurance obligations prohibiting sex discrimination in the operation of extracurricular activities for students would not be met. *Id.*; 20 U.S.C. § 7231d(b)(2)(C)(iii).

8

At this point, Education could have decided to deny CPS's continuation grant and end its MSAP project, which would have triggered an orderly closeout of the grant consistent with grant administration requirements. *See* 34 C.F.R. § 75.253. But rather than deny CPS's year-two continuation grant, and thereby end CPS's MSAP project, as explained to CPS by letters of September 27, November 2, and November 27, 2018, Education delayed making a decision regarding CPS's year-two continuation funding in order to provide CPS with additional time to demonstrate to the OCR Assistant Secretary that CPS would meet its required assurances. Complt. Exs. A, C; Rosenfelt Decl. ¶ 2. In order to accomplish this, Education extended CPS's year-one budget period. *Id*. This permitted CPS to continue its MSAP project by using unexpended year-one funds — reported by CPS to be $1,493,946 remaining from its grant of $2,672,187 — while CPS took steps to meet its nondiscrimination assurances as required by 20 U.S.C. § 7231d(c). 34 C.F.R. § 75.703; Wendell Decl. ¶¶ 3, 6; Alvarado Decl. ¶12.[8] To this end, Education provided CPS in a November 2 letter a list of specific recommendations to assist CPS in addressing issues to help secure the Assistant Secretary's certification that CPS would meet its nondiscrimination obligations. *See* Complt. Ex. C. CPS responded to this letter on December 21 and reported on its ongoing progress toward meeting its assurances. Rosenfelt Decl., ¶ 3.

Rather than return any unobligated FY 2018 funds to the Department of the Treasury (where they would be permanently unavailable to *any* grant recipient), Education obligated all remaining FY 2018 funds appropriated by Congress for MSAP to those grantees, including for other grantees' use during the third year of their projects. Rosenfelt Decl. ¶ 2. Under this approach, Education ensured that sufficient FY 2019 funds would be available to fund the year-two continuation of

---

[8] Wendell and Alvarado Declarations are filed by CPS with its motion.

CPS's multi-year project (the grant at issue in this case), provided that CPS demonstrates to the OCR Assistant Secretary that it will meet its assurances in FY 2019, obtains the Assistant Secretary's certification, and meets other continuation award requirements. *Id.* Because Education did not deny continuation funding to CPS and end its MSAP project, there have been no changes made to CPS's project/performance period. CPS continues with its STEM magnet school transformation, using grant funds from its year-one budget that continue to be available under its MSAP-funded project. Complt. ¶ 59.

If CPS is able to satisfy the OCR Assistant Secretary that CPS's nondiscrimination assurances "will be met" in FY 2019 and obtain the certification, Education will consider awarding MSAP year-two grant funds up to the amount of $4 million, in accordance with 34 C.F.R. § 75.253, using FY 2019 funds.[9] Complt. Ex. A; Rosenfelt Decl. ¶ 2. FY 2019 funds remain available for obligation until September 30, 2019. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019). If Education awards year-two continuation funds to CPS in FY 2019 and CPS is able to obtain the OCR Assistant Secretary's certification for the third, fourth, and fifth continuation years of the project, Education will review each continuation budget year in accordance with 34 C.F.R § 75.253. If Education determines that CPS has made substantial progress in achieving the goals and objectives of the project, that continuation of the project is in

---

[9] Aside from the civil rights assurances, the agency will need to determine whether CPS has made satisfactory progress during the first year of its grant, whether continuation is in the best interest of the federal government, and if so, determine the amount of new funding for the year-two continuation grant. 34 C.F.R. § 75.253 (c)(2) and (3). And, as with all grantees, the actual amount of CPS's continuation award would be based on multiple factors including its allowable expenditures, budget, and carryover funding. 34 C.F.R. § 75.253(d)(3).

the best interest of the federal government, and if Congress appropriates sufficient MSAP funds, CPS will receive MSAP funding for the entire five-year project period.[10]

## III.    CPS's Claims

CPS filed this lawsuit, asserting four claims under the Administrative Procedure Act. CPS alleges that the OCR Assistant Secretary's 2018 decision not to certify CPS's nondiscrimination assurances was arbitrary and capricious (Count. III) and exceeded the agency's authority (Count. IV). CPS also alleges Education improperly terminated CPS's MSAP grant by not providing notice and a hearing, as required under federal law (Counts. I-II). Subsequently, CPS filed this motion for a preliminary injunction.

## Argument

This court should not grant CPS a preliminary injunction because it already has the ultimate relief the motion seeks. As explained below, a $4 million, year-two continuation grant award may still be awarded to CPS using FY 2019 funds if CPS demonstrates to the OCR Assistant Secretary that it will meet its nondiscrimination assurances and satisfies the other requirements for an MSAP continuation award. The funds that CPS seeks to be restrained are in fact no longer available, but that does not prevent Education from funding CPS's year-two grant. In any event, issuance of a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted). In the first phase of analysis, the plaintiff must show three things: (1) that it will suffer irreparable harm prior to resolution of its claims, (2) some likelihood of success on the merits, and (3) no adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl*

---

[10]    CPS can seek to extend the project period to the extent it needs additional time to complete all the work anticipated in its five-year project. *See* 34 C.F.R. § 75.261.

*Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant fails on any one of these requirements, the court "must deny the injunction." *Id.* If the plaintiff satisfies the three threshold requirements, "the district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (internal quotation marks omitted). The court should deny CPS's motion because (1) it has no likelihood of success on the merits; (2) it will suffer no irreparable harm; and (3) the balance of hardships and public interest favor Education, which seeks to award needed grant funds to school districts while also ensuring they will comply with nondiscrimination obligations.

## I.      No Likelihood of Success on the Merits

CPS cannot succeed on the merits because it cannot state a claim for relief. First, CPS is not entitled to APA review since there has been no final agency decision. Even if there were a final agency decision, the decision is committed to agency discretion by law and is therefore unreviewable. Finally, the notice-and-hearing requirements invoked by CPS simply do not apply in this particular situation. For these reasons alone, the court should deny CPS's preliminary injunction and dismiss its complaint.

### A.  No Final Agency Action

CPS's claims are not actionable under the APA because Education has *not* made a final decision not to continue funding for CPS's MSAP project. Instead, Education has simply delayed its year-two continuation funding decision in order to give CPS additional time to demonstrate that it will meet its assurances so that the OCR Assistant Secretary can provide the required certification. Accordingly, this court should allow Education's administrative process to proceed.

12

Intervention, if ever appropriate, would only be so at the end of Education's decision-making process.

"Where there is no final agency action, a plaintiff has no cause of action under the APA." *Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998). The finality inquiry is governed by the two-prong test set forth by the Supreme Court in *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997). "First, the action must mark the 'consummation' of the agency's decision-making process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Herman*, 150 F.3d at 662 (citing *Bennett, id.*) ("the core question is whether the agency has completed its decision-making process, and whether the result of the process is one that will directly affect the parties."). CPS can satisfy neither of the two required prongs in this case.

Communication between the parties shows that Education did not make a final decision not to continue CPS's MSAP funding. Education advised CPS in its September 27, 2018 letter that due to the OCR Assistant Secretary's inability to certify CPS's assurances, MSAP year-two continuation funds could not be awarded at that time, but that Education would be in touch about next steps. Rather than not awarding the continuation grant and ending the project, Education explained that it would instead *delay* its year-two funding decision in order to provide CPS additional time both to continue its MSAP project using excess funds from year one and to take steps to meet its nondiscrimination assurances. One week later, on October 4, 2018, Education extended CPS's year-one budget period and allowed CPS to use $1.5 million of MSAP funds remaining from CPS's year-one grant for continued work starting in October 2018. Complt. Ex. B; Rosenfelt Decl. ¶¶ 2, 4.

One month later on November 2, 2018, Education provided specific recommendations for actions CPS could take to work toward meeting the MSAP nondiscrimination assurances. These recommendations were basic procedural steps that included, but were not limited to: (1) appointing and training a Title IX coordinator, per 34 C.F.R. § 106.8(a), who would be responsible for Title IX compliance; and (2) adopting and publishing grievance procedures, as required by 34 C.F.R. Part 106, so that students would know how to report incidents of sexual violence and CPS could appropriately resolve such complaints. On November 27, 2018, shortly before this lawsuit was filed, Education again indicated that it had not terminated the project or revoked the $4 million budgeted for year-two work, and that those funds would still be available to CPS if the OCR Assistant Secretary is able to certify that the assurances will be met and CPS otherwise satisfies the continuation funding requirements in 34 CFR 75.253. (It is not clear whether CPS reviewed the November 27 letter transmitted three days before this suit was filed.)

This effort to, hopefully, help enable CPS to take steps to meet its assurances continued after CPS filed this lawsuit. In its December 21, 2018 letter, CPS responded to Education's recommendations and described its actions in working to meet its MSAP assurances, including explaining that: (1) CPS has implemented many recommendations made by the consultant CPS hired in response to the *Chicago Tribune* investigative reports on sexual violence at CPS; (2) CPS has designated a Title IX coordinator, who is currently being trained for those responsibilities; (3) CPS has created a new office and a set of procedures for investigating and responding to incidents of CPS sexual misconduct, which it expects to implement by the end of the 2018-19 school year; and (4) CPS has committed to cooperating with all OCR investigations of Title IX complaints against CPS and to transmitting information about all complaints of sexual misconduct for the 2017-18 and 2018-19 school years. Rosenfelt Decl. ¶ 3. Education responded in January 2019,

14

encouraging CPS to continue its work towards obtaining its MSAP assurances certification and advised that the information shared by CPS in its December 21, 2018 response was being considered by OCR. *Id.* at ¶ 4.

The communications since September 27, 2018, show that Education has not made any decision regarding continuation funding for year-two of CPS's MSAP project, much less a "*final*" decision.[11] *See Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (noting that as part of the first *Bennett* prong, courts also look to "the way in which the agency subsequently treats the challenged action."). Indeed, had Education made a decision not to continue the project, it would have initiated grant close-out proceedings.

Nor has Education's delay caused a sufficiently direct and immediate impact on CPS. *See Western Illinois Home Health Care*, 150 F.3d at 661. Understanding that Education has not made a final funding decision, CPS has continued work on its MSAP project to enhance education in the "STEM" fields of science, technology, engineering, and math. The impact of CPS not receiving year-two funding in October 2018 has been largely mitigated because Education allowed CPS to use the $1.5 million that CPS had remaining from its year-one budget and because CPS additionally secured funding from other sources. As explained below in discussing CPS's purported irreparable injury, the fact that certain STEM teacher training and marketing may be delayed because of Education's funding delay does not constitute a sufficiently final impact, considering that: (1) the claimed training and marketing will simply be delayed, not cancelled; (2) the training and

---

[11] CPS's claims that the MSAP continuation funds were terminated or revoked appear to be based on a misunderstanding. CPS claims the $4 million grant funds for the year-two budget are no longer available because Education "obligated" those to other grantees. Complt. ¶ 51. As Education explained in its November 27, 2018 letter, no funds have been "cut off" or "withheld" from CPS and funds are still available for a year-two continuation award to CPS.

15

marketing delay is speculative, given that CPS did not use even half of the funds from its year-one budget; and (3) CPS's STEM program lasts five years and can be extended to incorporate all planned activities and expenditures.

Finally, CPS cannot satisfy the second prong of the *Bennet* inquiry because it cannot show that Education's funding delay is a decision that has determined any "rights or obligations" or from which "legal consequences will flow." As explained, the grant funds for CPS's year-two budget, as well as the remaining three years of funding, are still available for Education to award as long as CPS demonstrates that it will meet its MSAP nondiscrimination assurances and complies with the other ongoing requirements for future grant awards. Moreover, CPS has no *right* to receive continuation funds from consecutive fiscal years. Therefore, the delay in funding CPS's year-two budget does not affect any right or entitlement CPS may have.

### B. Decision Committed to Agency Discretion

Even if Education's decision to delay funding of CPS's year-two MSAP award were final for purposes of the APA, CPS still cannot challenge the OCR Assistant Secretary's non-certification because it is a decision that is "committed to agency discretion" under 5 USC § 701(a)(2) and therefore is not reviewable. Accordingly, this court should dismiss CPS's challenges to the OCR Assistant Secretary's decision on grounds that it is arbitrary and capricious (Ct. III) and exceeds agency authority (Count. IV).

The APA presumptively entitles a person suffering legal wrong because of agency action to judicial review. 5 U.S.C. § 702. But "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Such decisions are "committed to agency discretion" and are unreviewable. *Id.*, 5 U.S.C. § 701(a)(2);

16

*Lincoln v. Vigil*, 508 U.S. 182, 190-191 (1993) (no review "where the relevant statute or regulation is drawn so a court would have no meaningful standard against which to judge the agency's exercise of discretion" and thus there "is no law to apply.").

The agency action that CPS actually challenges here is the September 2018 judgment of the OCR Assistant Secretary that CPS has not demonstrated that it will meet its MSAP nondiscrimination obligations in the future. *Chaney* instructs courts to look to the applicable statute to determine whether Congress has provided the courts with "'law to apply.' If it has indicated an intent to circumscribe agency [ ] discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the agency follow that law; if it has not, then [the agency action] is 'committed to agency discretion by law.'" 470 U.S. 834-35. *See also Scalise v. Thornburgh*, 891 F.2d 640, 648 (7th Cir. 1989) (In determining whether there is a meaningful standard for purposes of review under § 701(a)(2), courts looks to the statutory language, the statutory structure, the legislative history, and the nature of the agency action).

But in this case, neither Congress nor Education have provided standards for "judging how and when [the] agency should exercise its discretion" in making this certification decision. The statute in question, 20 U.S.C. § 7231d(c), says simply that:

> No grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) [barring discrimination in three areas] will be met.

This does not provide courts with standards to judge whether the OCR Assistant Secretary has mistakenly evaluated a school district's likelihood of meeting its MSAP assurances in the future.

17

The decision whether to certify that a grantee's MSAP assurances will be met reflects the OCR Assistant Secretary's considered judgment about whether he believes, based on the information available to him, that CPS has demonstrated that it will meet these nondiscrimination assurances in the future. Absent any such standards or limitations applicable to the OCR Assistant Secretary's judgment in this matter, it is impossible for a reviewing court to determine whether the OCR Assistant Secretary's decision about not accepting CPS's assurances is arbitrary, capricious, or exceeds agency authority. *Community Action of Laramie County, Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("without manageable substantive standards against which to judge HHS's exercise of discretion, our review would amount to nothing more than an impermissible and ad hoc assessment of the fairness of agency action.").

CPS's arguments as to why the OCR Assistant Secretary's decision was arbitrary and exceeded agency authority highlight the discretionary nature of the Assistant Secretary's decision and why it is unreviewable. CPS claims it was arbitrary and capricious and exceeded the agency's authority for the OCR Assistant Secretary to predict that CPS would not meet its *future* civil rights obligations based in part on complaints of *past* violations that are still under investigation. Complt., ¶¶ 91-92, 101-108; CPS Brief at 13-15. But CPS points to no statute, regulation, or guideline prohibiting the OCR Assistant Secretary from considering evidence gathered in open investigations of civil rights violations to inform his prediction about whether a district may commit such violations in the future. Nor would such a rule make sense. One hopes that the OCR Assistant Secretary would consider open civil rights claims against CPS in evaluating whether CPS is likely to comply with MSAP nondiscrimination assurances — even if OCR has not completed its investigation. While predicting the future is always difficult, given the lack of standards, the court will not be in a better position to do that than is the OCR Assistant Secretary. In any event, the

18

discretionary nature of the Assistant Secretary's decision provides a reviewing court with no law or direction in resolving CPS's claim that OCR improperly considered complaints of past misconduct by CPS.

It is also worth pointing out that CPS has misunderstood the documents it relies upon to claim that the OCR Assistant Secretary's decision was based *solely* on two pending Title IX complaints. As explained above, the Assistant Secretary initially certified CPS's assurances in 2017 while it was still investigating two complaints by students alleging Title IX violations against CPS. Although these same two investigations remained pending in September 2018 when the OCR Assistant Secretary was unable certify that CPS would meet its more recent assurances, the circumstances had changed substantially by that time. After its 2017 certification, OCR had gathered one additional year of information from its ongoing Title IX investigations of CPS, OCR received *additional* Title IX complaints against CPS, and the *Chicago Tribune* published its investigative reports leading to an internal investigation by a firm hired by CPS detailing a district-wide failure by CPS to properly respond to student complaints of sexual violence. Collectively, this new information illustrated potential district-wide Title IX violations, and not just a few isolated instances. (This is not to suggest that CPS has not taken steps since then to work toward coming into compliance.)

Moreover, it is clear from CPS's own letters that CPS was missing basic mechanisms prior to the 2018-19 school year that are needed to properly prevent and respond to incidents of sexual violence against CPS students. For example, CPS did not have a Title IX coordinator, a team charged with responding to complaints of sexual violence, a comprehensive set of published policies, and comprehensive training for students, staff, and volunteers. Complt. Ex. C; Rosenfelt Decl. ¶ 3. Based on this and other information, the OCR Assistant Secretary determined in

September 2018 that his concerns about CPS's Title IX compliance for the upcoming school year prevented him from certifying that CPS would comply with its MSAP nondiscrimination obligations. And while CPS appears to have begun the process of addressing these deficiencies, the proposed remedial systems are new and some will not be implemented until at least the end of the 2018-19 school year.

Even though CPS's claims of arbitrariness and exceeding agency authority are undermined by the facts and documents it presents here, this court should not review the OCR Assistant Secretary's decision, as it is committed to the discretion of the agency. There are no substantive standards by which to judge the exercise of discretion that Congress placed with the OCR Assistant Secretary. Accordingly, even if the court finds that Education's delay in funding was a final decision for purposes of the APA, it should still dismiss CPS's claims in Counts III and IV as unreviewable.

### C. Notice-and-Hearing Requirements Do Not Apply.

CPS claims in Counts I and II that Education's failure to provide notice and a hearing before making its decision to delay year-two funding to CPS violates three federal laws: (1) 2 C.F.R. § 200.340-41; (2) the General Education Provisions Act (GEPA), 20 U.S.C. § 1234d(b); and (3) Title IX, 20 U.S.C. § 1682. But even if APA review were available, and it's not, CPS's notice-and-hearing claims would still fail since the referenced procedural protections do not apply. Accordingly, Counts I and II should be dismissed for failure to state a claim.

CPS's claims in Count I based on the regulations should be dismissed because Education's decision to delay continuation funding to CPS constitutes neither a "termination" nor a "suspension" as described in 2 C.F.R. §§ 339-341. No decision has been made about CPS's year-two continuation grant, and there have been no changes to CPS's project/performance period.

20

Indeed, there have not even been changes made to the scope and objectives of CPS's approved MSAP project. Therefore, Education has not "terminated" CPS's project under 2 C.F.R. § 200.339-341 or "suspended" funds already awarded. Rather, Education extended the first-year budget period from 12 to 24 months, thereby permitting CPS to continue its project using MSAP funds remaining at the end of the first 12 months of the project period. If Education eventually decides not to fund year two of MSAP's project, it will then consider appropriate grant administration requirements for the orderly closeout of a grant.

Nor does Education's funding delay constitute a "withholding" under GEPA because Education has not taken away CPS's ability to use funds already obligated to it. 20 U.S.C. § 1234d. As explained in Education's Discretionary Grants Handbook, a "withholding" suspends a grantee's ability to access grant funds awarded by the agency until the grantee takes the corrective action required by the agency.[12] Thus, a withholding applies only to funds that the agency *has obligated* (*i.e.*, already awarded) to a grantee. Education never obligated MSAP funds to CPS for its year-two budget, so delaying a decision on whether to award this funding does not constitute a withholding. Indeed, the agency did just the opposite of a withholding here, by extending the first-year budget period so that CPS would still have access to the already obligated FY 2017 funds for an additional 12 months to use for its MSAP project.

Additionally, CPS's notice-and-hearing claims under Title IX in Count II should also be dismissed because no MSAP grant funds were terminated or withheld. Even if CPS were correct that a mere delay in making a decision about its year-two MSAP continuation grant constituted a termination or withholding, Title IX's procedural protections still would not apply. Education's

---

[12] *See* Department of Education Discretionary Grants Handbook, p. 223, *available at* https://www2.ed.gov/policy/gen/leg/foia/acshbocfo4a.pdf.

decision regarding the MSAP grant at issue was not made pursuant to Title IX, but rather was based on the MSAP statute itself.

Title IX authorizes Education to terminate funds to a recipient of federal financial assistance when it has made a finding that the recipient has discriminated against a person on the basis of sex in violation of Title IX in an education program or activity, and Education and the recipient cannot reach voluntary resolution. 20 U.S.C. § 1682; 34 C.F.R. § 106.71; 34 C.F.R. § 100.6-100.11; 34 C.F.R. Part 101.

In this case, however, the parties agrees that Education's decision to delay a year-two continuation award to CPS was based on the OCR Assistant Secretary's decision not to certify CPS's nondiscrimination assurances under MSAP, *not* on a finding that CPS has violated Title IX. Complt. Ex. A; 20 U.S.C. § 7231d(c). CPS Mem. 5, 12-15. Nor is OCR's assurance-certification responsibility under MSAP even a part of OCR's responsibility to enforce Title IX. *See, e.g.*, 20 U.S.C. § 7231d(b)(2)(C) (making no mention of Title IX). Were OCR to consider terminating CPS's funds under Title IX (based on a finding that CPS violated Title IX), *all* of CPS's federal financial assistance from Education would potentially be at issue, not just its MSAP year-two continuation award. 20 U.S.C. § 1682. For these reasons, CPS has failed to state a claim that the Title IX procedural provisions have been triggered here. This is another reason why CPS has no likelihood of success on the merits and why the preliminary injunction should be denied.

## II. No Irreparable Injury

CPS also has failed to satisfy its burden of demonstrating that it will suffer irreparable injury. First, there is no need for any injunctive relief because CPS already has the ultimate relief it seeks. Specifically, CPS's motion seeks an order requiring that Education keep available for CPS's use the $4 million budgeted for year-two continuation of its MSAP grant. According to its

papers, CPS plans to address the OCR Assistant Secretary's concerns over CPS's future compliance with MSAP nondiscrimination assurances. As explained, however, in a letter sent to CPS before it filed this lawsuit, the $4 million sought for year-two funding remains available to CPS if it obtains the OCR Assistant Secretary's certification that it will meet its MSAP nondiscrimination assurances and meets other continuation award requirements. As noted above, CPS may not have reviewed the November 27 letter before filing this suit three days later and so mistakenly believed that it needed judicial intervention to secure the relief it already had.

Second, CPS has failed to establish how *maintaining* the status quo constitutes irreparable injury. CPS's MSAP grant funds are intended to transform three existing elementary schools into STEM magnet schools. The delayed funding will not cause CPS to close those schools, lay off any teachers, or cut any services that currently exist. Nor does CPS claim it will discontinue its STEM transformation project or eliminate programs already developed and implemented under this project. Indeed, CPS acknowledges that notwithstanding the delayed funding, it is continuing with its STEM transformation plan, even though certain planned items for the 2018-19 school year, like teacher development and marketing, may be delayed. Such delays do not constitute irreparable injury.

Finally, CPS's allegations regarding delays in MSAP-funded projects are speculative. Indeed, CPS budgeted $2.6 million for year one of the project but needed (or used) [13] less than half

---

[13] It is unclear whether CPS seriously over-estimated the cost of the work it expected to accomplish in year one of its project or failed to accomplish much of what it planned to do. If the former, then the $1.5 million will allow CPS to perform much of the work starting in October 2018 that it planned for in its year-two budget. If the latter, Education's extension of the year-one budget and the use of unused year-one funds benefits CPS by allowing it more time to complete the year-one work it never finished.

of those funds.  Not only will CPS not need $4 million to pursue the magnet-school project if its year-two budget estimates are similarly mistaken, but it already has over $2 million in mostly leftover MSAP grant funds to continue its school transformation project during the current school year.[14]  Thus, the delays in implementing CPS's project are both speculative and unlikely.

### III. Balance of Hardships and Public Interest Weigh Against Injunctive Relief.

Finally, the balance of harms and the public interest weigh against granting injunctive relief. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, (2008) (internal quotation marks and citation omitted).  If CPS could satisfy the threshold requirements of irreparable injury and likelihood of success on the merits, this court would yet need to "balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest."  *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (internal quotation marks omitted).   "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted).  Given that CPS already has the relief it seeks in its preliminary injunction motion, the equities can only weigh against an injunction.  Moreover, an injunction against Education of any type would greatly harm Education and the public interest.

---

[14] In addition to the remaining $1.5 from its first-year budget, CPS also has $800,000 from other sources for use in its MSAP project.  Wendell Decl. ¶ 2

Congress granted Education several tools to ensure that school districts are protecting students and complying with their nondiscrimination obligations. Among them is the requirement, unique to MSAP, that OCR's Assistant Secretary determine whether school districts *will* meet nondiscrimination assurance *before* awarding them MSAP funds. Prematurely interfering with Education's discretionary decision in carrying out this important task will greatly harm Education's ability to make and oversee grants designed to further the public interest in education settings free from discrimination. Moreover, it will undermine the public faith in government and the public interest. This is particularly true here, where Education balances its interest in awarding grants to CPS for important educational programs and its mandate to ensure that CPS protects students from sexual harassment and abuse and properly responds to such incidents when they happen.

### Conclusion

For the foregoing reasons, this court should deny plaintiff's motion for a preliminary injunction and dismiss its complaint.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Patrick W. Johnson
      PATRICK W. JOHNSON
      Assistant United States Attorney
      219 South Dearborn Street
      Chicago, Illinois 60604
      (312) 353-5327
      patrick.johnson2@usdoj.gov

25