**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, | Case No. 18-cv-7914 |
| *Plaintiff,* | |
| v. | Hon. Andrea R. Wood |
| BETSY DEVOS, in her capacity as Secretary of the United States Department of Education, and UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants.* | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION AND
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

I.    The Court Should Enter an Order Preserving the Department's Concession that
      CPS Has Obtained the Relief It Seeks in its Motion for a Preliminary Injunction ............ 2

II.   Dismissal Should be Denied and a Preliminary Injunction Entered Because CPS is
      Likely to Succeed on the Merits ..................................................................... 3

      A.    The Department's "Decision Not to Award FY 2018 MSAP Funds to CPS"
            Was a Final Agency Action ....................................................................... 3

      B.    The Department's Action Does Not Fall into the Narrow Exception for
            Actions "Committed to Agency Discretion" ............................................. 7

      C.    The Notice and Hearing Requirements Apply ......................................... 11

            1.    Notice and a Hearing Required by GEPA and the Applicable
                  Regulations ............................................................................. 12

            2.    Notice and a Hearing Required by Title IX ............................... 14

III.  CPS Will Suffer Irreparable Harm Absent a Preliminary Injunction ............................ 15

IV.   The Balance of the Equities and the Public Interest Favor Injunctive Relief .................. 18

CONCLUSION .................................................................................................. 19

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................................... 3, 6, 7

*Arizona State Bd. for Charter Sch. v. U.S. Dep't of Educ.*,
    391 F. Supp. 2d 800 (D. Ariz. 2005) .................................................................... 7

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................... 3, 7

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986) ........................................................................................... 8

*Califano v. Sanders*,
    430 U.S. 99 (1977) ............................................................................................. 3, 8

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................... 8

*Fogel v. Dep't of Def.*,
    169 F. Supp. 2d 140 (E.D.N.Y. 2001), aff'd, 36 F. App'x 473 (2d Cir. 2002) ........ 7

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................................... 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ........................................................................................... 8

*Marlo M. ex rel. Parris v. Cansler*,
    679 F. Supp. 2d 635 (E.D.N.C. 2010) ................................................................. 18

*Nat'l Cable & Telecommunications Assn. v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................................................................... 6

*Planned Parenthood Greater Memphis Region v. Dreyzehner*,
    853 F. Supp. 2d 724 (M.D. Tenn. 2012) ............................................................. 16

*Sackett v. E.P.A.*,
    566 U.S. 120 (2012) ........................................................................................... 6

*Schneider Nat., Inc. v. I.C.C.*,
    948 F.2d 338 (7th Cir. 1991) ............................................................................. 8

*Singh v. Moyer*,
867 F.2d 1035 (7th Cir. 1989) ........................................................................ 8

*Texas Children's Hosp. v. Burwell*,
76 F. Supp. 3d 224 (D.D.C. 2014) ...................................................... 15, 17, 19

*U.S. Army Corps of Engineers v. Hawkes Co.*,
136 S. Ct. 1807 (2016) .................................................................................. 6

*W. Illinois Home Health Care, Inc. v. Herman*,
150 F.3d 659 (7th Cir. 1998) .......................................................................... 3

*X.P. Vehicles, Inc. v. Dep't of Energy*,
118 F. Supp. 3d 38 (D.D.C. 2015) .............................................................. 6, 7

**STATUTES**

20 U.S.C. § 1234d .......................................................................................... 12

20 U.S.C. § 1234d(a) ..................................................................................... 12

20 U.S.C. § 1682 ............................................................................................ 14

20 U.S.C. § 7231d(c) ................................................................................. 9, 10

5 U.S.C. § 701(a) ............................................................................................. 8

5 U.S.C. § 701(a)(2) ..................................................................................... 7, 8

**RULES**

2 C.F.R. § 200 ................................................................................................ 13

2 C.F.R. § 200.339-341 ............................................................................ 12, 13

2 C.F.R. § 200.341 ......................................................................................... 14

2 C.F.R. Part 200 ........................................................................................... 11

34 C.F.R. § 75.253 ........................................................................................... 4

34 C.F.R. § 100.6-100.11 ............................................................................... 14

34 C.F.R. § 106.71 ......................................................................................... 14

34 CFR Part 101 ............................................................................................ 14

Plaintiff the Board of Education of the City of Chicago ("CPS") hereby submits this Reply in support of its Motion for a Preliminary Injunction (ECF No. 8) and in Opposition to the Motion to Dismiss (ECF No. 34) of Defendants Secretary Betsy DeVos and the U.S. Department of Education (collectively, "the Department").

## INTRODUCTION

On September 27, 2018, the Department of Education informed CPS that it was "unable to award FY 2018 continuation grant funds to CPS," characterizing that determination as a "decision not to award FY 2018 MSAP funds." That decision—which cut off funding for the second year of CPS's Magnet School Assistance Program ("MSAP") program—was a final agency action, with real and direct consequences. No matter how the Department attempts to recast its September 2018 decision or recharacterize the status quo, the fact remains that CPS has not received $4 million in second-year grant funding for the STEM programs at three CPS schools serving economically disadvantaged students. The Department's decision to withhold this funding lacked procedural and substantive merit, and through its motion to dismiss and opposition to CPS's Motion for a Preliminary Injunction, the Department seeks to avoid review of that decision. The Court should reject that attempt.

As a threshold matter, the Department concedes in its brief that CPS has already received the relief that it seeks in its motion for a preliminary injunction. CPS sought to preserve the status quo pending the resolution of this action by moving to enjoin the Department from spending elsewhere the $4 million allocated to CPS. If, as the Department states in its brief, those funds remain available to CPS, and the Department intends to retain those funds until the parties can resolve this dispute, then the Court need not rule on Plaintiff's motion, but rather should enter an order preserving that concession.

1

In any event, each of the Department's arguments in favor of dismissal and against preliminary injunctive relief lacks merit. First, the Department's decision to halt year-two funding was the consummation of a decision-making process and will have specific legal consequences, and is therefore a final agency action. Second, the narrow exception to the presumption in favor of reviewability for agency actions "committed to agency discretion" does not apply here because the MSAP statute provides the Court with the legal framework necessary to review the Department's decision. Third, contrary to the Department's contention, the MSAP grant is subject to statutory and regulatory procedural requirements, and the Department's decision to withhold the second year of the grant funding violated those rules. The Department's further objections specific to the preliminary injunction motion—that CPS' allegedly faces only "speculative" harm, and that the balance of the equities weigh against relief—likewise fall short. Accordingly, the Department's Motion to Dismiss should be denied, and CPS's motion for a Preliminary Injunction should be granted.

I.     **The Court Should Enter an Order Preserving the Department's Concession that CPS Has Obtained the Relief It Seeks in its Motion for a Preliminary Injunction**

The Court need not rule on the merits of CPS's motion for a preliminary injunction because the Department concedes that CPS "already has the ultimate relief" that it sought in its motion for a preliminary injunction. (ECF No. 33 (Defendants' Response to Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support of Motion to Dismiss ("Def. Mem.")) at 11) CPS sought to enjoin the Department from "disbursing Plaintiff's Fiscal Year 2018 Magnet School Assistance Program grant funds to other jurisdictions pending final resolution of this case." (ECF No. 8-1.) In its brief, the Department states that "funds are still available for a year-two continuation award to CPS," and that "a $4 million, year-two continuation grant award may still be awarded to CPS using FY 2019 funds if CPS demonstrates to the OCR Assistant Secretary that

it will meet its nondiscrimination assurances and satisfies the other requirements for an MSAP continuation award." (Def. Mem. at 11, 15 n.11; *see also* at 23 ("[T]he $4 million sought for year-two funding remains available to CPS if it obtains the OCR Assistant Secretary's certification that it will meet its MSAP nondiscrimination assurances and meets other continuation award requirements.").) Counsel for CPS proposed that the parties provide an agreed order to the Court which would preserve the Department's position in exchange for CPS's withdrawal of the motion, but counsel for the Department declined. Given the Department's acknowledgement that those funds remain available, the Court should enter an order to that effect, which would obviate the need to rule on the merits of CPS's motion.

## II. Dismissal Should be Denied and a Preliminary Injunction Entered Because CPS is Likely to Succeed on the Merits

### A. The Department's "Decision Not to Award FY 2018 MSAP Funds to CPS" Was a Final Agency Action

The Department's September 27, 2018 letter was a final agency action. "As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted). Courts have interpreted the finality requirement of the APA in a "flexible" and "pragmatic way." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 150 (1967), *abrogated in part on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *W. Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998) (citations omitted).

Regarding the first *Bennett* factor, the Department contends that there has been no consummation of the agency's decision-making process because no decision has been made regarding CPS's second-year MSAP funding. (Def. Mem. at 12-13.) But in his September 27, 2018 letter, Acting Assistant Deputy Secretary Jason Botel made clear that the agency had, in fact, made a final decision regarding those funds. He stated that the Office of Innovation and Improvement ("OII") "is unable to award FY 2018 continuation grant funds to CPS based on the requirements in 34 C.F.R. § 75.253." (ECF No. 20 (Declaration of Joseph Moriarty in Support of Plaintiff's Motion for Preliminary Injunction ("Moriarty Decl.")), Ex. A.) According to the Acting Deputy Secretary for OII, this decision was the result of an internal decision-making process. He relied on a "conclusion" by the OCR Assistant Secretary—not a preliminary assessment— regarding CPS's ability to meet its civil rights assurances. *Id.* The Acting Assistant Secretary specifically characterized the agency's action as "OII's *decision not to award* FY 2018 MSAP funds to CPS[.]" *Id.* (emphasis added). It is difficult to envision a more categorical statement of a final agency action.

The Court need look no further than the language of the September 27, 2018 letter to determine that the agency had consummated its decision-making process. The Department nevertheless now argues that its "decision not to award FY 2018 MSAP funds" was, in fact, a decision to *delay* a decision on the FY 2018 funds so that CPS could provide additional information to OCR. (Def. Mem. at 12.) In support, the Department points not to the September 27, 2018 letter—which does not reference a "delay" in the funding decision—but to correspondence that post-dates the September 27, 2018 letter.

The chronology of the post-September 27 letters reveals the Department's evolving explanation for its decision to withhold the second year MSAP grant funds. On October 4, 2018,

CPS requested both a hearing and the basis for the Department's decision to cut off the grant funding.  (Moriarty Decl. Ex. B.)  The Department's November 2, 2018 response did not respond to CPS's request, and further did not state that the Department had decided to merely "delay" grant funds.  (Moriarty Decl. Ex. C.)  Rather, the Department reconfirmed in this letter that its September 27, 2018 letter contained "OII's decision not to award Chicago Public Schools' (CPS) fiscal year (FY) 2018 continuation grant funds under the Magnet Schools Assistance Program (MSAP)." (*Id.*)[1]  It was not until November 27, 2018 that the Department sent CPS a letter claiming that CPS had "misunderstood" the Department's action and that, according to the Department, no grant funds had been terminated or withheld.  (Rosenfelt Decl. Ex. A.)  But the Department did not revise its previous decision not to award CPS the second-year MSAP funds and did not address CPS's procedural complaints.[2]  Nor did the Department provide a timeline for when it would make its decision as to whether CPS will regain its eligibility for the funds, either in the November 27 letter, or in its subsequent letters on January 15, 2019 and on March 13, 2019.  (ECF No. 36 (Supplemental Declaration of Joseph Moriarty), Exs. A and B.)

In sum, the post-September 27, 2018 letters advised CPS that the Department may someday revisit its funding decision and award second-year MSAP funding to CPS.  But an agency cannot avoid finality merely by dangling the possibility that it might be persuaded to change its position

---

[1]  The November 2 letter further provided guidance to CPS on how to meet its civil rights assurances in order to be eligible for FY 2019 grant funds although disclaiming that engaging in these steps assures that the Department will find CPS in compliance.  (Moriarty Decl. Ex. C.)  In response to this letter, on December 21, 2018, CPS sent the Department a six-page letter outlining all the steps CPS had taken and would take regarding its Title IX compliance.  (ECF No. 33-1 (Declaration of Philip Rosenfelt ("Rosenfelt Decl.")), at Ex. B.)

[2]  The Department makes much of the fact that the November 27 letter was sent prior to the filing of this lawsuit.  But the letter had no substantive impact on the dispute between the parties, and did not change the fact that the Department made a decision to withhold FY 2018 MSAP grant funding CPS without proper process.

in the future. *See Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."); *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016) (citing *Sackett*, 566 U.S. at 127 and *Nat'l Cable & Telecommunications Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)) (finding that the fact that an agency may later revise its decision based on new information "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *see also X.P. Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 59-60 (D.D.C. 2015) (holding that the denial of a plaintiff's application on eligibility criteria, as opposed to the merits of the application, was final, despite efforts by the plaintiff to seek reconsideration of that decision). The Department may, at some point, reconsider its decision not to award second-year grant funds— and indeed, CPS hopes that the Department will do so. But whether or not the Department ultimately changes course does not impact the finality of the decision announced in the September 27, 2018 letter.

Putting aside the language of the Department's post-September 27, 2018 correspondence, the Court should take a practical approach to the question of whether the Department's decision constituted a final agency action. *Abbott Labs.*, 387 U.S. at 149 ("[C]ases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way[.]"). It is undisputed that the Department decided not to obligate $4 million in MSAP grant funds for the second year of CPS's MSAP grant in September 2018. CPS has not, to date, received those funds. It is also undisputed that the Department decided to reallocate CPS's second-year grant funds to other jurisdictions. The Department does not deny that it has done so. The decision to halt CPS's MSAP grant funding was the result of an agency decision-making process—a process that CPS

contends violated the APA, but a decision-making process nonetheless. Regardless of how the Department may now frame its actions, the decision not to provide MSAP grant funds to CSP in September 2018 and to reallocate the funds elsewhere was not hypothetical, tentative, or interlocutory. It was final.

Regarding the second *Bennett* factor, the Department's decision not to award FY 2018 MSAP funds to CPS also fixed rights and obligations between the parties and has resulted in legal consequences. In determining whether this factor is met, courts examine whether the action has had a "sufficiently direct and immediate" impact on the aggrieved party and a "direct effect on [its] day-to-day business." *Abbott Labs.*, 387 U.S. at 152. As described in more detail in below, the loss of MSAP funding has forced CPS to drastically scale back the STEM programs at the three schools and to redirect funds to the program from other CPS funding sources. These are legal consequences sufficient to indicate finality. *See X.P. Vehicles, Inc.*, 118 F. Supp. 3d at 60 ("it is clear beyond cavil that the rejection of a request for a government benefit ... 'fixes some legal relationship' between a private party and the government"); *Arizona State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800, 802 (D. Ariz. 2005) (determination by the Department of Education that for-profit charter schools would no longer receive federal funding resulted in "legal consequences" sufficient to meet the second *Bennett* prong); *Fogel v. Dep't of Def.*, 169 F. Supp. 2d 140, 149 (E.D.N.Y. 2001), aff'd, 36 F. App'x 473 (2d Cir. 2002) (finding that a denial of benefits "was the legal consequence that flowed from the decision," rendering the decision a final agency action).

## B. The Department's Action Does Not Fall into the Narrow Exception for Actions "Committed to Agency Discretion"

The Department moves to dismiss Counts III (arbitrary and capricious decision) and IV (*ultra vires* conduct) and avoid a preliminary injunction on the grounds that the OCR Assistant

Secretary's decision not to certify CPS's assurances was "committed to agency discretion" under 5 U.S.C. § 701(a)(2). (Def. Mem. at 16.) This argument fails for several reasons.

There is a "basic presumption of judicial review" of final agency action. *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (noting "the strong presumption that Congress intends judicial review of administrative action"). That presumption may be overridden when the agency action is committed to agency discretion by law. 5 U.S.C. § 701(a); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The "committed to agency discretion" exception is a "very narrow exception" that "is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting *Sanders*, 430 U.S. 99, 105 (1977); *Chaney*, 470 U.S. at 830; *Schneider Nat., Inc. v. I.C.C.*, 948 F.2d 338, 343 (7th Cir. 1991) ("Whether or not an agency action is unreviewable under 5 U.S.C. § 701(a)(2) turns on whether or not there is 'law to apply.'"). In determining whether the exception applies, courts examine the statutory language, the statutory structure, the legislative history, and the nature of the agency action. *Singh v. Moyer*, 867 F.2d 1035, 1038 (7th Cir. 1989).

As a preliminary matter, the Department misconstrues the action at issue in Count III of the Complaint. In that count, CPS seeks to invalidate the decision of the Acting Assistant Deputy Secretary of OII to withhold FY 2018 MSAP grant funding, not the decision by the OCR Assistant Secretary regarding CPS's assurances. *See* Complaint ("Compl.") ¶¶ 89 ("The Department's decision to withhold FY 2018 MSAP grant funding from CPS constituted a final agency decision."); 91 ("OII has failed to articulate a rational and lawful explanation for its action of terminating CPS's FY 2018 MSAP funding."); 93 (". . . CPS is entitled to a declaration that the Department's termination of CPS's FY 2018 MSAP funding was arbitrary and capricious and an

order that the Department's decision be set aside.").  The Department does not argue in its brief that OII's decision to withhold the CPS's grant funding was committed to agency discretion and is therefore nonreviewable.  Though the Department contends that "[t]he agency action that CPS actually challenges here is the September 2018 judgment of the OCR Assistant Secretary," Def. Mem. at 17, that is a misreading of the plain language of Count III of the Complaint.  Accordingly, separate and apart from its merits, the Department's "committed to agency discretion" argument cannot form the basis to dismiss Count III, because the argument as presented in the Department's motion does not apply to the action alleged in that Count.[3]

Regarding the OCR Assistant Secretary's decision not to certify CPS's assurances, the Court has ample law to apply in determining whether the decision exceeds statutory authority.  The MSAP statute requires that, before the Department may issue an MSAP grant, the OCR Assistant Secretary must "determine[] that the assurances described in subsection (b)(2)(C) will be met."  20 U.S.C. § 7231d(c).  Those "assurances described in subsection (b)(2)(C)," provided by the applicant, include the following:

> (C) [the applicant will] not engage in discrimination based on race, religion, color, national origin, sex, or disability in—
>
> > (i) the hiring, promotion, or assignment of employees of the applicant or other personnel for whom the applicant has any administrative responsibility;
> > (ii) the assignment of students to schools, or to courses of instruction within the schools, of such applicant, except to carry out the approved plan; and
> > (iii) designing or operating extracurricular activities for students[.]

---

[3] In its reply brief in support of its motion to dismiss, the Department may contend that there is no difference between the Acting Assistant Deputy Secretary of OII's decision to withhold funding and the OCR Assistant Secretary's decision not to certify CPS's assurances, because the latter informed the former.  But the two decisions are distinct, as are the legal theories under which CPS challenges the actions in the Complaint.

*Id.* § 7231d(b)(2)(C)(i–iii). Reading the two sections of the MSAP statute together, the OCR Assistant Secretary does not have unfettered discretion as to the factors he may consider when making his determination under the MSAP statute. He must base his analysis on the specific subject matter areas required by the MSAP statute—*not* a general review of civil rights compliance or non-discrimination obligations—and his determination must relate to whether the assurances in these areas "will be met." *Id.* § 7231d(c).

As CPS alleges in the Complaint, and as the correspondence between the parties demonstrates, the OCR Assistant Secretary went beyond these three subject matter areas in making his determination. (Compl. ¶¶ 104-106.) In OCR Assistant Secretary's partially redacted memorandum reflecting the basis for his decision, the Assistant Secretary does not identify concerns with the hiring of employees, assignment of students, or design or operation of extracurricular activities. (Moriarty Decl. Ex. D.) The OCR Assistant Secretary referenced complaints against CPS, but these complaints do not concern these three subject areas. (Compl. ¶ 104.) In its Response Brief, the Department also cites newspaper articles and an independent report commissioned by CPS to justify its decision that CPS will not meets its assurances. (Def. Mem. at 7.) Tellingly, these articles and the independent report do not appear in the unredacted portions of the memorandum supporting the OCR Assistant Secretary's decision. But even if they were included in the memorandum, these articles and the independent report do not identify any concerns about discrimination in the hiring of employees, assignments of students, or design or operations of extracurricular activities.

In addition to considering factors outside of the three subject matter areas provided by the statute, the OCR Assistant Secretary failed to apply the directive of the statute to determine whether CPS's assurances "will be met." Based on the limited rationale provided in its letters and

redacted memorandum, the decision appears to be based on alleged incidents that occurred *prior to* the second year of the grant period—indeed, potentially several years before year two of the grant—and not a predictive decision that CPS's assurances "will be met" *during* the second year of the grant period. (ECF No. 19 (Mem. of Law in Supp. of Pl's Motion for a Prelim. Inj. ("CPS Mem.")) at 15.) The Department argues that the statute does not prohibit the OCR Assistant Secretary from considering evidence gathered in open investigations to make its certification under the MSAP statute. (Def. Mem. at 19.) As a general proposition, that may be correct; but here, the Department does not identify any *new* information that it did not have when it previously certified CPS's civil rights assurances in the original grant application.[4]

In short, the Court is more than capable of applying the MSAP statute to the OCR Assistant Secretary's decision in this case. Because the MSAP provides a statutory reference point for the Court's review, the presumption in favor of reviewability of agency action remains intact.

## C.     The Notice and Hearing Requirements Apply

The Department next contends that Counts I and II should be dismissed, and preliminary relief denied, because the statutory and regulatory procedural requirements do not constrain the Department's decision. These arguments either misconstrue the statutory or regulatory authority, or rest upon the Department's faulty contention that "[n]o decision has been made about CPS's year-two continuation grant," (Def. Mem. at 20), and therefore lack merit.

---

[4] The Department also argues that CPS did not have certain mechanisms in place prior to the current school year related to its civil rights programs. CPS learned for the first time from the Department's brief that these alleged deficiencies formed, in part, the basis for the OCR Assistant Secretary's decision. (Def. Mem. at 19-20.) These concerns were not articulated in the unredacted portions of the memorandum explaining the OCR Assistant Secretary's decision. Regardless, as the Department acknowledges, CPS either addressed or had taken significant steps to address these concerns. *Id.*

### 1. Notice and a Hearing Required by GEPA and the Applicable Regulations

The Department concedes that the MSAP grant is governed by GEPA and the Uniform Administrative Requirements, Cost Principles, and Audit Awards Requirements for Federal Awards in 2 C.F.R. Part 200. The Department nevertheless argues that its decision to withhold CPS's FY 18 funds was not a "withholding" under GEPA or a "termination" or a "suspension" under 2 C.F.R. § 200.339-341. (Def. Mem. at 20-21.) But the authority the Department cites supports CPS's reading of the statute, not the Department's.

First, the Department argues that its September 27 decision did not constitute a "withholding" under GEPA because the Department "has not taken away CPS's ability to use funds already obligated to it," citing 20 U.S.C. § 1234d. (Def. Mem. at 21.) That argument is a non sequitur. Under the statute, the Department "may withhold from a recipient, in whole or in part, further payments (including payments for administrative costs) under an applicable program." 20 U.S.C. § 1234d(a). That is precisely what happened here. The Department decided to withhold "further payments" of the MSAP grant from CPS, not to withhold "funds already obligated to it." The Department suggests that § 1234d only applies to funds that it wishes to "claw back" from a grantee, but that is not what the language of the statute states. Because the Department withheld funds under subsection § 1234d(a) of GEPA, it was required to follow the procedural requirements of the following subsection:

> Before withholding payments, the Secretary shall notify the recipient, in writing, of— (1) the intent to withhold payments; (2) the factual and legal basis for the Secretary's belief that the recipient has failed to comply substantially with a requirement of law; and (3) an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the recipient.

*Id.* § 1234d(b). The Department failed to follow these requirements, and therefore CPS is likely to show that the Department's decision not to award the FY 2018 MSAP grant was without observance of the procedures required by law and must be set aside.

Second, the Department cites the Discretionary Grants Handbook to define the term "withholding" as "suspend[ing] a grantee's ability to access grant funds awarded by the agency until the grantee takes corrective action required by the agency." (Def. Mem. at 21.)[5] But that is not the full definition of the term. The full definition, in the Glossary to the Handbook, states the following:

> **Withholding of Payment**. An action taken by ED, *after appropriate administrative procedures have been provided*, that suspends a grantee's ability to access its grant funds until the grantee takes the corrective action required by ED.

The Department of Education Discretionary Grants Handbook, at 161, *available at*

https://www2.ed.gov/policy/gen/leg/foia/acshbocfo4a.pdf (emphasis added). Therein lies the crux of CPS's claim: the Department failed to follow the appropriate administrative procedures before withholding the MSAP grant funds.

The Department further contends that the MSAP grant has not been "suspended" or "terminated" under 2 C.F.R. § 200.339-341 because "[n]o decision has been made about CPS's year-two continuation grant." (Def. Mem. at 20-21.) Again, the language of the Department's September 27, 2018 letter to CPS belies that argument. The letter explicitly states that the Department "is unable to award FY 2018 continuation grant funds to CPS," that it had made a "decision not to award FY 18 MSAP funds to CPS," and that it had concluded that "CPS' project

---

[5] Because the Handbook was not referenced in or attached to the Complaint, it should not be considered in ruling on the Department's Motion to Dismiss. Additionally, the page cited for that definition—page 223—contains no such definition. The definition for "withholding of payment" is found at page 161 of the document.

is not eligible for FY 2018 MSAP continuation funding." (Moriarty Decl. at Ex. A.) The Department's *ex post facto* attempts to paint its termination of CPS's FY 2018 funds as a mere "delay" are unconvincing and do not insulate the Department's decision from the due process requirements of 2 C.F.R. § 200. Under that regulation, "[u]pon taking any remedy for non-compliance, the Federal awarding agency must provide the non–Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action, in accordance with written processes and procedures published by the Federal awarding agency." 2 C.F.R. § 200.341. The Department failed to follow those procedures in its decision to suspend the grant and not award MSAP funds to CPS.

## 2.  Notice and a Hearing Required by Title IX

The Department based its withholding of CPS's FY 2018 MSAP funds on the conclusion of the OCR Assistant Secretary that CPS's sex-based non-discrimination obligations "will not be met" during FY 2018. Title IX sets forth detailed procedural requirements that OCR must follow before it makes such a determination and before it revokes federal funding from a recipient due to noncompliance with non-discrimination requirements on the basis of sex. 20 U.S.C. § 1682. The process by which OCR may make a finding and withhold funding based on noncompliance with non-discrimination requirements must be conducted pursuant to Title IX's process.

While the Department correctly asserts that OCR could terminate all of CPS' federal funds under Title IX, not just MSAP funds, it could not do so unless and until it complied with all of the procedural elements *and* CPS refused to resolve voluntarily any issues of noncompliance. 20 U.S.C. § 1682; 34 C.F.R. § 106.71; 34 C.F.R. § 100.6-100.11; 34 CFR Part 101. OCR has not even made any findings that CPS is out of compliance, and CPS has not refused to comply with a voluntary resolution agreement. While the Assistant Secretary must determine whether a district

14

will meet its assurances, that decision cannot and should not be used to make an end run around Title IX's requirements.

### III.    CPS Will Suffer Irreparable Harm Absent a Preliminary Injunction

As demonstrated in CPS's opening brief, CPS will suffer real and irreparable harm absent the entry of preliminary injunctive relief.  (CPS Mem. at 15-18.)  In response, the Department first argues that the Court need not enter preliminary injunctive relief because CPS "already has the ultimate relief the motion seeks."  (Def. Mem. at 22, 24.)  As noted in Section I above, given the Department's concession, the Court should enter an order requiring Defendants to retain $4,023,426.00 to be obligated to Plaintiff for year-two MSAP grant funds, in order to preserve those funds while this dispute is resolved.

The Department next argues that the current status quo does not warrant injunctive relief because the STEM programs continue at the three schools and the "[t]he delayed funding will not cause CPS to close those schools, lay off any teachers, or cut any services that currently exist." (Def. Mem. at 23.)  This argument fails for several reasons.  First, the Department mischaracterizes the harm at issue.  While the three schools do not face closure and the teachers remain employed, the STEM programs at the three schools are very much in jeopardy.   (ECF No. 21 (Declaration of Anna M. Alvarado in Support of Plaintiff's Motion for Preliminary Injunction ("Alvarado Decl.")), ¶¶ 8-13; *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 n.7 (D.D.C. 2014) ("Defendants['] argument that 'monetary loss constitutes irreparable harm only where the loss threatens the very existence of the [movant's] business,' . . . misses the point—plaintiffs may not be driven out of business, but programs they provide may be.").

Second, though the STEM programs at the three schools have continued, they have done so on a "scaled-back" budget resulting from a loss of FY 2018 funds.  (ECF No. 22 (Declaration

of Heather Wendell in Support of Plaintiff's Motion for Preliminary Injunction ("Wendell Decl.")), ¶¶ 5-6; Alvarado Decl. ¶ 10.) This contingency solution harms CPS's ability to provide the full scale of services to the economically disadvantaged communities of the three schools. *See Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 738 (M.D. Tenn. 2012) (cuts in funding requiring scale-back of services constitute irreparable harm).

Moreover, that the programs have continued in spite of the budgetary uncertainty created by the withdrawal of funding is a testament to CPS's dedication to keep the programs alive, not a lack of harm. CPS and the teachers, parents, and students at the three schools have invested substantial time and resources in the success of the schools' STEM programs. After the Department awarded CPS the five-year MSAP grant and provided $2.6 million into the program in FY 2017, CPS began the process of transforming three CPS elementary schools into high quality STEM magnet schools. CPS purchased equipment and science-based technology, opened new teacher coaching positions, added hourly pay to develop teachers into high-quality STEM instructors, began a lottery system designed to attract a diverse student population, and developed a budget for completing the transformation with MSAP funds. (Alvarado Decl. ¶¶ 6-7, 11.) These programs have positively impacted CPS students in these schools, and furthered CPS's and the Department's goals of desegregating schools. CPS wants these programs to continue and to thrive.

Contrary to the Department's suggestion, CPS's efforts to cobble together $800,000 in funding from other CPS sources through its contingency budget does not mitigate the harm. These diverted funds should have been used to support other vital CPS programming in areas such as social or emotional learning, personalized learning, and instructional coaching. (Wendell Decl. ¶ 5.) In order to keep the STEM programs at the three schools afloat, CPS shifted $800,000 in funding to the programs. (*Id.* ¶¶ 4-5) Of that $800,000, approximately $400,000 remains, and that

16

must last until September 2019. (ECF No. 36 (Supplemental Declaration of Heather Wendell ("Supp. Wendell Decl.")), ¶ 5.)[6] Even with the limited reallocation of resources, the total expenditure in CPS's contingency budget falls far short of the $4 million originally granted by the Department for FY 2018. (Wendell Decl. ¶ 6.) The reallocation of resources from these other CPS sources demonstrates the harm that CPS faces. *See Burwell*, 76 F. Supp. 3d at 243-244 (forcing plaintiff to reallocate resources contributes to harm that would be caused by lost funding). Similarly, the fact that CPS successfully initiated the STEM programs under its FY 2017 budget, such that it had a reserve of funding at the end of the year, only demonstrates CPS's efforts to manage the program with frugality.[7] In any event, CPS knew that the expenses of the second year of the program would far exceed those of the first year. That is why the second year of the grant was budgeted to almost double the costs of the first year.

Finally, the harm to CPS from the Department's refusal to provide the second-year grant funds is not "speculative," as the Department contends. The lack of CPS's FY 2018 funds has directly impacted and irreparably harmed teachers, students, and CPS's ability to recruit students, which in turn harms its mission of desegregating and diversifying its schools. The denial of funds has stunted teacher development. Specifically, CPS was forced to cut planned teacher pedagogical development at conferences, cut or seriously curtail teacher professional development through third-party vendors, and not realize CPS's plan for teachers to work collaboratively on units and

---

[6] CPS attaches a Supplemental Declaration of Heather Wendell to this memorandum not to provide new facts regarding the MSAP program, but to update the figures provided in the declaration submitted in December 2018. The Department will be able to respond to this supplemental declaration in its final brief.

[7] The carryover FY 2017 funds are quickly declining. On November 30, 2018, CPS had $1,493,946 in FY 2017 carryover Grant funds. (Wendell Dec. ¶ 3). As of March 20, 2019, CPS had approximately $750,000 remaining in FY 2017 funds for the MSAP grant program. (Supp. Wendell Decl. ¶ 4.)

integrative instruction.  (Alvarado Decl. ¶¶ 9, 10.)  Well-trained teachers are paramount to high-quality STEM education and the recruitment of a diverse student body to magnet schools. Delaying teacher training denies students the benefit of quality education.  The denial of CPS's FY 2018 grant has also irreparably harmed student growth and learning.  In addition to the harm to students from teachers unable to complete the necessary training to run a high-quality STEM magnet school, students are also harmed by CPS's inability to provide planned field trips, enrichment, and extra-curricular programming, in addition to other opportunities for students to learn more about, engage in, and expand their interests in STEM.  (Alvarado Decl. ¶ 10.)  Without the FY 2018 funds, CPS has been unable to carry out the fulsome marketing and recruiting efforts necessary to attract the diverse pool of student applicants needed to create magnet schools and support CPS's school desegregation efforts.  (Alvarado Decl. ¶ 11.)

### IV.    The Balance of the Equities and the Public Interest Favor Injunctive Relief

MSAP grant funds help predominantly Hispanic and African-American children in economically disadvantaged neighborhoods gain access to high-quality STEM programs.  The public has an interest in desegregated schools and well-taught schoolchildren.  In addition, the public faith in government is protected by holding the Department to its own rules.  *See Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) ("the public interest lies with upholding the law").  All of these interests weigh in favor of an injunction.  The Department does not challenge these interests, but instead counters that the public also has an "interest in education settings free from discrimination."  (Def. Mem. 25.)  CPS shares the Department's commitment of ensuring equal access to education and the protection of students' civil rights, which is why CPS has gone to great lengths to demonstrate its efforts to protect the safety and welfare of its students.  (ECF No. 33-1 Ex. B.)  On balance, the equities favor an injunction, especially given

that it will "serve[] only 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Burwell*, 76 F. Supp. at 245.

## <u>CONCLUSION</u>

For the foregoing reasons, CPS respectfully requests that the Court grant its motion for a preliminary injunction and deny the Department's motion to dismiss.

Dated: March 27, 2019                                  Respectfully submitted,

                                                       */s/ John K. Theis*

Michael A. Warner, Jr.                                 Ronald S. Safer
Nicki B. Bazer                                         Kelly M. Warner
Jacqueline Wernz                                       John K. Theis
FRANCZEK RADELET                                       Patricia T. Mathy
300 S. Wacker Drive, Suite 3400                        RILEY SAFER HOLMES & CANCILA LLP
Chicago, IL 60606                                      70 W. Madison Street, Suite 2900
*t* (312) 986-0300                                     Chicago, IL 60602
*f* (312) 986-9192                                     *t* (312) 471-8700
maw@franczek.com                                       *f* (312) 471-8701
nbb@franczek.com                                       rsafer@rshc-law.com
jfw@franczek.com                                       kwarner@rshc-law.com
                                                       jtheis@ rshc-law.com
                                                       pmathy@rshc-law.com

**_Attorneys for Plaintiff The Board of Education of the City of Chicago_**

19

## CERTIFICATE OF SERVICE

I, John K. Theis, certify that on March 27, 2019, I filed a copy of the foregoing document electronically using the Court's CM/ECF system, which will generate notice of this filing to all counsel of record.

*/s/ John K. Theis*
John K. Theis